OPINION
{¶ 1} Appellants, C.G., Sr., K.G., C.G., and M.G., appeal from the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, adjudicating M.E.G. an abused, neglected and dependent child, and adjudicating C.G., M.G., and D.G., dependent children.[1] Pursuant to those findings, temporary custody of all the children was awarded to Franklin County Children Services ("FCCS").
 {¶ 2} On January 6, 2005, FCCS filed a complaint alleging that M.E.G. was an abused, neglected, and dependent child pursuant to R.C.2151.031(A), 2151.03(A)(2), and 2151.04(C), respectively, based on allegations that M.E.G. had been sexually abused by her father, C.G., Sr. Because of the allegations with respect to M.E.G., a second complaint was filed regarding M.E.G.'s siblings, alleging C.G. and M.G. were dependent children pursuant to R.C. 2151.04(C). During the pendency of the *Page 3 
proceedings, D.G. was born on September 2, 2005, and FCCS filed a new complaint alleging D.G. was a dependent child pursuant to R.C.2151.04(C).
 {¶ 3} After the adjudication hearings, the magistrate issued a decision on November 16, 2005, finding M.E.G. to be an abused, neglected, and dependent minor child, and finding C.G., M.G., and D.G. to be dependent minor children. Based on the foregoing, FCCS was granted temporary custody of all the children. M.E.G. was placed in a foster home and the other children were placed with their paternal grandmother. C.G., Sr., K.G., C.G., and M.G. timely filed objections to the magistrate's decision. A hearing on the objections was held on June 20, 2006, and on November 20, 2006, the trial court overruled the parties' objections, and approved and adopted the magistrate's decision. These appeals followed.
 {¶ 4} Appellant C.G., Sr. has filed the following four assignments of error:
 I. THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT ADMITTED INTO EVIDENCE OUT-OF-COURT STATEMENTS MADE BY THE ALLEGED VICTIM TO A SOCIAL WORKER.
 II. THE COURT ERRED WHEN IT REFUSED TO PERMIT THE APPELLANT TO IMPEACH THE ALLEGED VICTIM'S TESTIMONY WITH PRIOR INCONSISTENT STATEMENTS.
 III THE TRIAL COURT ERRED WHEN IT COMPELLED THE APPELLANT TO TAKE THE STAND TO TESTIFY AGAINST HIMSELF IN VIOLATION OF HIS FIFTH AMENDMENT RIGHT AGAINST SELF-INCRIMINATION.
 IV. THE TRIAL COURT'S FINDING THAT MEG. WAS AN ABUSED AND DEPENDENT CHILD AND THAT [M.G] AND *Page 4 
C.G. WERE DEPENDENT CHILDREN IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
 {¶ 5} Appellant K.G. has filed the following two assignments of error:
 [I.] THE TRIAL COURT ERRED BY FINDING THAT [MEG] IS AN ABUSED, NEGLECTED AND DEPENDENT CHILD AND THAT [C.G.], [M.G.] AND [D.G.] ARE DEPENDENT MINORS AS SUCH A FINDING IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
 [II] THE TRIAL COURT ERRED BY UPHOLDING THE DECISION OF THE MAGISTRATE WHEN THE MAGISTRATE'S NUMEROUS "HARMLESS ERRORS" INFRINGED ON APPELLANT'S CONSTITUTIONAL RIGHT TO DUE PROCESS AND A FAIR TRIAL.
 {¶ 6} Appellants C.G. and M.G. have filed the following two assignments of error:
 [I.] THE COURT ERRED WHEN IT FOUND THAT [M.E.G.'S] STATEMENTS TO DEBBIE FOURNIER THAT WERE ADMITTED INTO EVIDENCE WERE HARMLESS ERROR.
 [II.] THE COURT ERRED WHEN IT FOUND THAT [M.E.G.] IS AN ABUSED, NEGLECTED AND DEPENDENT CHILD AND [C.G.], [M.G.], AND [D.G.] WERE DEPENDENT CHILDREN BY CLEAR AND CONVINCING EVIDENCE. THIS FINDING IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
 {¶ 7} The above-stated appeals have been consolidated here for review.
 {¶ 8} As indicated previously, this matter concerns three children alleged to be dependent minor children, and one child alleged to be an abused, neglected, and dependent minor child. The adjudication hearing was held over ten days beginning on July 27 and concluding on October 24, 2005. *Page 5 
 {¶ 9} According to M.E.G., who at the time of the hearing was 12-years old and had just finished the sixth grade, she would get home from school around 3 p.m., and she would often watch DVDs in her parents' bedroom. Sometimes she would lie on the bed, sometimes she would lie on the floor, and sometimes her father would be lying down with her. M.E.G. testified that on occasion she would fall asleep and wake up to her father touching her on her breasts and between her legs. M.E.G. indicated the first time her father did this was "around Thanksgiving," and that this happened around six times. (Aug. 15, 2005 Tr. 79-81.) According to M.E.G., sometimes her father would take her clothes off or put his hand down her shirt or pants, and sometimes he would "put his finger inside" her. Id. at 81. According to M.E.G., the last time this happened was around Christmas 2004 when the family was staying at the hotel where both of her parents worked. The family was staying at the hotel because of a power outage. Family friends were also staying at the hotel and M.E.G.'s brother and sister had gone to play with their friends. M.E.G. described being in the room using the computer on the bed where her father was sleeping when she fell asleep and woke up to her father touching her in "both places." Id. at 83.
 {¶ 10} Reynoldsburg Police Detective Bill Early was the lead investigator assigned to this case after getting a referral of sexual abuse from FCCS. Detective Early interviewed C.G., Sr. about the allegations regarding M.E.G. C.G., Sr. told Detective Early that he and M.E.G. did sleep in the same bed from time to time, and there was an incident where he woke up and noticed his hand on her breast. When asked whether he *Page 6 
ever touched M.E.G.'s vagina or inner thigh, C.G., Sr. indicated he could not remember, but "that he might have done something while he was asleep." (July 27, 2005 Tr. 30.) When asked about Ashleigh, his daughter from a previous marriage and the allegation of sexual contact with her, C.G., Sr. described to Detective Early that there was an incident during the summer of 2004 when C.G., Sr. woke up in bed and discovered Ashleigh on top of him naked and trying to insert his penis into her vagina. C.G., Sr. relayed that though he tried to inappropriately kiss Ashleigh before, there was nothing more in regards to sexual contact. C.G., Sr. also described that after M.E.G. heard about this incident, M.E.G. attempted to have C.G., Sr. touch her vagina, but he did not go any further than her stomach.
 {¶ 11} On cross-examination, Detective Early testified that C.G., Sr. told him that he woke up next to M.E.G., she was pretending to be asleep and his hand was just below her breast, and that's why he thought M.E.G. was trying to be like her big sister Ashleigh. C.G., Sr. also told Detective Early "I think if I had touched her vagina I would remember it." (Aug. 15, 2005 Tr. 42.)
 {¶ 12} C.G., Sr. testified at the hearing, but after answering a few preliminary questions he asserted his Fifth Amendment rights against self-incrimination to all remaining questions.
 {¶ 13} Debbie Fournier, who was employed at the Child Assessment Center at Children's Hospital, interviewed M.E.G. on January 19, 2005, as part of an assessment for medical diagnosis and treatment of victims of sexual abuse. According to Ms. *Page 7 
Fournier, M.E.G. was able to narrate her purpose for being there and indicated it was because "her dad was being a `pervert and touched me and took all three of us out.'" (Aug. 25, 2005 Tr. 15.) M.E.G. indicated to Ms. Fournier that the first time this happened was two days before Thanksgiving and the last time it happened was the last day of December. According to Ms. Fournier, M.E.G. reported that she would fall asleep on her father's bed and she would wake up and her father would be touching her "bad" spots.
 {¶ 14} K.G. testified, but asserted her Fifth Amendment right against self-incrimination in response to most of the questions posed. K.G. did describe, however, that she only heard M.E.G. testify that C.G., Sr. put his hand on her stomach, and that she did not believe M.E.G.'s testimony about what happened.
 {¶ 15} Jennifer Reed, a caseworker with FCCS, interviewed M.E.G. at M.E.G.'s school. Upon hearing M.E.G.'s statement, Ms. Reed determined it was unsafe for M.E.G. to return home and transported her to FCCS. Thereafter, K.G., C.G., and M.G., met with Ms. Reed at FCCS. Ms. Reed described K.G. as angry and hysterical. K.G. agreed to sign a safety plan, though she initially refused to do so. When Ms. Reed informed K.G. that M.E.G. would be placed with FCCS, K.G. told Ms. Reed to tell M.E.G. that K.G. did not want M.E.G. to come back to the family. (Sept. 26, 2005 Tr. 21.)
 {¶ 16} Sarah Nadler, a family case manager with Ohio Youth Advocate Program ("OYAP") was assigned to M.E.G.'s family from January to June 2005. Ms. Nadler would supervise the family visits held at OYAP that were held weekly for two hours. Ms. Nadler *Page 8 
described that while K.G. would greet C.G. and M.G., she would rarely even speak to M.E.G.
 {¶ 17} Joyce Robinson, manager at the hotel where both K.G. and C.G., Sr. were employed full-time, testified on behalf of C.G., Sr. Ms. Robinson described both K.G. and C.G., Sr. as good employees. Ms. Robinson testified that C.G., Sr. and his family stayed at the hotel during the power outage and at no time did she see any of C.G., Sr.'s children alone for any amount of time.
 {¶ 18} Paula Wigal, an acquaintance of the family, testified that her power was also out during December 2004, and she and her family stayed at the hotel where C.G., Sr. and K.G. worked. During the stay, Ms. Wigal testified that she and her husband, Bernie Cline, watched C.G., Sr.'s kids while K.G. and C.G., Sr. worked and/or slept. Ms. Wigal did not remember any of C.G., Sr.'s kids ever being alone, but testified that M.E.G. would be allowed to be alone because she was part of the older kids' group.
 {¶ 19} Bernard Cline, Sr. testified that during the stay at the hotel, M.E.G. was not allowed to be alone. Bernard Cline, Jr. was also present at the hotel during the power outage and he testified he never saw M.E.G. alone with her father. However, both Bernard Cline, Jr. and Sr. admitted that they were not aware of M.E.G.'s whereabouts at all times.
 {¶ 20} After reviewing the evidence, the magistrate found by clear and convincing evidence that M.E.G. was the victim of sexual activity and was an abused, neglected, and dependent minor child. The magistrate also found D.G., C.G. and M.G. to be dependent *Page 9 
minor children. The magistrate concluded that continuation in the children's own home would be contrary to their welfare and granted temporary custody of all four children to FCCS.
 {¶ 21} C.G., Sr., K.G. and C.G. filed objections to the magistrate's decision, alleging the magistrate erred in compelling C.G., Sr. and K.G. to take the stand and testify in violation of their Fifth Amendment right against self-incrimination; the magistrate erred in permitting M.E.G.'s statements to Ms. Fournier to be admitted into evidence; the magistrate erred in refusing to permit C.G., Sr. to impeach M.E.G. with prior inconsistent statements; the magistrate's finding that M.E.G. is an abused, neglected, and dependent minor child and that C.G. and M.G. are dependent children is against the manifest weight of the evidence; and the magistrate erred in compelling the parents' counsel to disclose documentary evidence that was intended for the purpose of impeachment. The trial court held a hearing on said objections, and on November 20, 2006, entered a decision overruling the objections and adopting the decision of the magistrate.
 {¶ 22} Because they are interrelated, C.G., Sr.'s first as well as C.G. and M.G.'s first assignments of error will be addressed together. In these two assignments of error, it is argued that statements made by M.E.G. to the social worker, Ms. Fournier, were not admissible.
 {¶ 23} "A trial court has broad discretion in the admission or exclusion of evidence, and its judgment will not be reversed absent a clear showing of an abuse of discretion with attendant material prejudice to the defendant." State v. Rowe (1993), *Page 10 92 Ohio App.3d 652, 665, citing State v. Hymore (1967), 9 Ohio St.2d 122. See, also,Schultz v. Schultz (1996), 110 Ohio App.3d 715, citing Krischbaum v.Dillon (1991), 58 Ohio St.3d 58, 66 (stating, in part, that "[i]n the absence of an abuse of that discretion which results in a material prejudice to a defendant, an appellate court should be slow to reverse evidentiary rulings").
 {¶ 24} "The term `abuse of discretion' connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." Blakemore v. Blakemore (1983),5 Ohio St.3d 217, 219. When applying the "abuse of discretion" standard, an appellate court is not free to merely substitute its judgment for that of the trial court. State v. Sibert (1994), 98 Ohio App.3d 412, 424.
 {¶ 25} Evid.R. 801(C) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Regarding the admissibility of hearsay, Evid.R. 803(4) provides as follows:
 The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
 * * *
 (4) Statements for purposes of medical diagnosis or treatment. Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment. *Page 11 
 {¶ 26} A social worker is permitted to testify about a declarant's statements pursuant to Evid.R. 803(4) if the social worker encountered the declarant for the purpose of medical diagnosis or treatment.State v. Nasser, Franklin App. No. 02AP-1112, 2003-Ohio-5947, at ¶ 52, citing State v. Chappell (1994), 97 Ohio App.3d 515.
 {¶ 27} Appellants contend in the case sub judice, none of M.E.G.'s statements were admissible because the function of Ms. Fournier was not to gather information for the purpose of medical diagnosis or treatment but, rather, was a subterfuge to gather information for law enforcement. This court recently addressed a similar issue in State v.Edinger, Franklin App. No. 05AP-31, 2006-Ohio-1527, where the defendant complained that the victim's statements to a social worker did not fall under the hearsay exception contained in Evid.R. 803(4). TheEdinger court indicated that a court must look to the function of the particular social worker to determine whether or not it was permissible for the social worker to testify concerning statements under Evid.R. 803(4). Id. at ¶ 62, relying on Chappell, supra, and State v.Woods, Cuyahoga App. No. 82789, 2004-Ohio-2700. See, also, State v.Jordan, Franklin App. No. 06AP-96, 2006-Ohio-6224. In Edinger, this court concluded:
 First, unlike the children in both Chappell and Woods, who were interviewed by social workers employed by the county, P.S. was interviewed by a social worker specifically employed by Children's Hospital in the Child Advocacy Center, which is a part of Children's Hospital itself. Secondly, the social worker testified that the interview with the child was solely for the purposes of medical treatment and diagnosis. In the present case, the role of the social worker did not involve reporting to the police and did not involve decisions to remove the child *Page 12 
from the home. The stated function of the social worker was specifically for medical treatment and diagnosis. While it is true that the police were permitted to observe the interview by way of closed circuit television, the police did not contact the social worker to set up the interview as happened in the Woods case, nor was the child aware of their presence.
Id. at ¶ 63.
 {¶ 28} Here, M.E.G. was interviewed by Ms. Fournier, a social worker employed by Children's Hospital in the Child Assessment Center. Ms. Fournier testified that the sole purpose of an interview is for medical diagnosis and treatment of victims of sexual abuse. C.G., Sr. draws attention to Ms. Fournier's testimony regarding the team that was present at the interview and was able to view the interview via a closed circuit television. While he is correct that Ms. Fournier testified that a Children's Services worker, two OYAP workers, and a victim's advocate from the prosecutor's office were present, he omits the testimony regarding the presence of Dr. Phil Scribano and a mental health advocate. After the interview, Ms. Fournier verbally communicated the information to Dr. Scribano "to make sure he had all the information he needed for his medical diagnosis and treatment" and to the mental health advocate and children's services professionals who were present. Thereafter, Dr. Scribano performed a physical examination of M.E.G.
 {¶ 29} Ms. Fournier admitted the interview was recorded and that after the interview the recording would be sent to law enforcement. However, as in Edinger, there is no indication that law enforcement initiated this interview or that the victim was aware that law enforcement could be permitted to watch the interview. Given these *Page 13 
circumstances, merely because there is a policy in place to preserve potential evidence in a sexual abuse case that is secondary to the medical examination, we cannot find that such policy automatically converts Ms. Fournier's function from gathering information for medical treatment and diagnosis to one of gathering information for law enforcement. Therefore, we find that Ms. Fournier was properly permitted to testify concerning M.E.G.'s statements made to her.
 {¶ 30} Alternatively, appellants contend that even if Ms. Fournier was qualified to testify regarding M.E.G.'s statements under Evid.R. 803(4), many of the statements provided were not pertinent to medical diagnosis and treatment and were therefore, inadmissible. C.G., Sr. cites to the following testimony of Ms. Fournier: (1) the minor child told her that C.G., Sr. was a pervert and took all three of the kids out and that her mother was at work when the alleged abuse occurred; (2) the minor child denied touching any part of C.G., Sr.; (3) the alleged abuse occurred either at the house or a hotel room, and there were no witnesses to the incidents; (4) M.E.G. would be asleep each time before C.G., Sr. would touch her; (5) all of M.E.G.'s clothes would be off and C.G., Sr. would have his pants and underwear on; (6) when in the hotel room, M.E.G. was using a laptop computer and fell asleep; and (7) M.E.G.'s siblings were in the hotel room next to her.
 {¶ 31} In reviewing appellant's objections to the above-cited testimony, the trial court held that while the mother's whereabouts, the location of the incidents and her activities are less likely to be related to the diagnosis or treatment, "any error was *Page 14 
harmless because M.E.G. had already testified at length on all of these issues." (Decision at 8.) We agree with the trial court's assessment.
 {¶ 32} "Any error in the admission of hearsay is generally harmless where the declarant of the hearsay statement is cross-examined on the same matters and the seemingly erroneous evidence is cumulative in nature." State v. Holloman, Franklin App. No. 06AP-01, 2007-Ohio-840, at ¶ 32, citing State v. Turner, Franklin App. No. 04AP-364,2004-Ohio-6609, citing State v. Tomlinson (1986), 33 Ohio App.3d 278,281. See, also, State v. Brazzon, Trumball App. No. 2001-T-0050,2003-Ohio-6088; In re Corrigall (April 19, 2001), Cuyahoga App. No. 76921. Even assuming the challenged statements were improperly admitted, appellants have failed to demonstrate prejudicial error.
 {¶ 33} M.E.G. testified on direct examination and provided a detailed account of what occurred. M.E.G. was cross-examined at length about the alleged incidents, thus appellants were provided the opportunity to cross-examine the declarant on the subject matter. The record reveals Ms. Fournier's testimony regarding what M.E.G. told her was cumulative to M.E.G.'s testimony. Thus, we conclude that any error in the admission of the challenged statements was harmless.
 {¶ 34} Based on the foregoing, C.G., Sr.'s first assignment of error, and C.G. and M.G.'s first assignment of error are overruled.
 {¶ 35} In his second assignment of error, C.G., Sr. contends the trial court erred when it refused to permit him to impeach the alleged victim's testimony with prior inconsistent statements. C.G., Sr. asserts that M.E.G. made statements to Ms. Reed in *Page 15 
which M.E.G. initially denied that any abuse occurred, and then that it occurred only two times, and then finally changing it to five or six times. C.G., Sr. also asserts that M.E.G. told Ms. Reed that he would be watching television or using the computer, rather than sleeping or lying on the bed as M.E.G. testified. Additionally, C.G., Sr. asserts that M.E.G. told Ms. Reed that she never saw what he was wearing at the time of the abuse, even though she told the social worker he had been wearing pants and/or underwear. Arguing that Evid.R. 607 does not apply, C.G., Sr. contends the failure to admit such statements were error and prejudicial to him.
 {¶ 36} We note again that trial courts have broad discretion in the admission and exclusion of evidence, and its judgment will not be reversed absent a clear showing of an abuse of such discretion with material prejudice to the complaining party. Rowe, supra. We also find, as did the trial court, that Evid.R. 607 is not applicable in this circumstance but, rather, Evid.R. 613 is the applicable rule and provides:
 (B) Extrinsic evidence of prior inconsistent statement of witness. Extrinsic evidence of a prior inconsistent statement by a witness is admissible if both of the following apply:
 (1) If the statement is offered solely for the purpose of impeaching the witness, the witness is afforded a prior opportunity to explain or deny the statement and the opposite party is afforded an opportunity to interrogate the witness on the statement or the interests of justice otherwise require;
 (2) The subject matter of the statement is one of the following:
 (a) A fact that is of consequence to the determination of the action other than the credibility of a witness; *Page 16 
 (b) A fact that may be shown by extrinsic evidence under Evid. R. 608(A), 609, 616(A), 616(B) or 706;
 (c) A fact that may be shown by extrinsic evidence under the common law of impeachment if not in conflict with the Rules of Evidence.
 {¶ 37} Thus, under Evid.R. 613(B), a party may introduce extrinsic evidence of a witness's prior inconsistent statement to impeach the witness's credibility. However, in order for extrinsic evidence of a prior inconsistent statement to be offered into evidence, a proper foundation must be established. Evid.R. 613(B). Fowler v. Coleman, Franklin App. No. 04AP-248, 2005-Ohio-1518. "If a witness denies making the statement, a proper foundation has been laid, and the evidence does not relate to a collateral matter, extrinsic evidence is admissible."Fowler, at ¶ 19, quoting State v. Riggins (1986), 35 Ohio App.3d 1, paragraph two of the syllabus. If a witness admits having made the contradictory statements, then extrinsic evidence is inadmissible.State v. Crawford (Feb. 6, 1986), Franklin App. No. 85AP-324; State v.Farris, Clark App. No. 2003 CA 77, 2004-Ohio-5980.
 {¶ 38} With respect to the exclusion of Ms. Reed's testimony regarding M.E.G.'s statements about what C.G., Sr. would be doing prior to the alleged abuse, i.e., watching television as opposed to sleeping, because M.E.G. was not asked whether she told Ms. Reed about C.G., Sr.'s activities, no foundation was laid for the introduction into evidence. Thus, there was no error in its exclusion. *Page 17 
 {¶ 39} Regarding the removal of clothing, M.E.G. explained on cross-examination that when she told the social worker that all of her clothes were off, she meant only that some were removed. Thus, M.E.G.'s statement to Ms. Reed was not admissible since M.E.G. admitted and explained the perceived contradiction. Similarly, M.E.G. admitted on cross-examination that she told Ms. Reed the abuse happened only two times, then changed it to five or six. Therefore, these challenged statements were not admissible.
 {¶ 40} Lastly, we turn to C.G., Sr.'s contention that he was prevented from introducing evidence from Ms. Reed that M.E.G. initially denied any sexual abuse. On cross-examination, when asked whether she denied to Ms. Reed that any sexual abuse occurred, M.E.G. said "no." Thus, the requisite foundation set forth in Evid.R. 613 was established. However, our inquiry does not end here, as we must now determine whether the trial court's failure to admit the testimony prejudiced C.G., Sr. We find that C.G., Sr. is unable to establish the same. As noted by the trial court, the magistrate discussed M.E.G.'s initial denial of sexual abuse and concluded that such a denial was not an abnormal response for a child of M.E.G.'s age. Thus, there is nothing to indicate the trial court would have reached a different conclusion had the magistrate not sustained the objection regarding the statement.
 {¶ 41} Based on the foregoing, we overrule C.G., Sr.'s second assignment of error.
 {¶ 42} In his third assignment of error, C.G., Sr. contends it was error to compel him to take the stand to testify against himself in violation of his Fifth Amendment right against self-incrimination. When C.G., Sr. was called as a witness, C.G., Sr.'s attorney *Page 18 
attempted to enter an objection asserting his Fifth Amendment right to remain silent. The magistrate overruled the objection and stated that C.G., Sr. had to be sworn in as a witness and then exercise hisFifth Amendment right to individual questions. Once sworn in, C.G., Sr. answered questions regarding his name, address, marriage, number of children and their ages. Thereafter, C.G., Sr. proceeded to assert hisFifth Amendment right to the remaining questions. When it became apparent C.G., Sr. would be asserting his Fifth Amendment right for all remaining questions, the magistrate allowed him to step down as a witness. At no time was C.G., Sr. required to answer any questions. In overruling C.G., Sr.'s objection to the magistrate's decision regarding this issue, the trial court concluded the magistrate followed the correct procedure as proscribed by law.
 {¶ 43} C.G., Sr. contends the magistrate erred in compelling him to take the stand because the Fifth Amendment privilege applies to any proceeding whether criminal or civil, and it protects any disclosures which the witness may reasonably believe could be used in a criminal proceeding or which could lead to other evidence that might be so used.
 {¶ 44} The Fifth Amendment to the United States Constitution provides, in pertinent part: "No person * * * shall be compelled in any criminal case to be a witness against himself." "It is well-recognized that the constitutional protection afforded by the Fifth Amendment applies both to the accused in criminal proceedings and to witnesses in criminal and civil proceedings." Tedeschi v. Grover (1988), 39 Ohio App.3d 109, 110, citing Lefkowitz v. Turley (1973), 414 U.S. 70, 77, 94 S.Ct. 316. In the context of criminal *Page 19 
proceedings, the Fifth Amendment privilege secures to the accused the right not to testify. Id. Similarly, in civil proceedings the amendment prohibits the state from compelling a witness to testify as to matters which may tend to incriminate in subsequent proceedings. Id., citingMcCarthy v. Arndstein (1924), 266 U.S. 34, 45 S.Ct. 16. Compulsion, in this sense, arises whenever some penalty, be it imprisonment or economic coercion, is imposed for failing to offer testimony. Id.
 A witness, even though he has previously indicated that he will refuse to testify on the ground that to do so would incriminate him, may be called as a witness.
 "As stated in State v. Snyder (1953), 244 Iowa, 1244, 1248, 59 N.W. (2d), 223:
 "The general rule is, as stated in 58 Am. Jur., Witnesses, Section 53, that "although a witness cannot be compelled to give incriminating testimony, he must if properly summoned appear and be sworn."' His privilege is available only as a witness and cannot be extended so as to excuse him from appearing. If the witness himself cannot escape being sworn by claiming in advance that he will refuse to testify, certainly the defendant, against whom such witness is offered, cannot claim greater rights.' See, also, 8 Wigmore on Evidence, 402, Section 2268.
 The possibility that a witness may claim the privilege does not prohibit the prosecutor from asking questions. Commonwealth v. Granito, [(1950), 326 Mass. 494].
Columbus v. Cooper (1990), 49 Ohio St.3d 42, 44-45, quoting State v.Dinsio (1964), 176 Ohio St. 460, 466.
 {¶ 45} In support of his position that calling him to the witness stand violated his Fifth Amendment right against self-incrimination, C.G., Sr. relies on In re Knight (1999), *Page 20 135 Ohio App.3d 172, and In re Billman (1993), 92 Ohio App.3d 279. InKnight, the Eighth Appellate District, relying on Billman, concluded that in a neglect case it was error for the trial court to overrule the mother's objection to being called to testify where the mother argued her testimony could lead to possible criminal charges. However, it is unclear whether or not the mother was permitted to assert herFifth Amendment right once she was sworn in as a witness, or whether she was compelled to testify. In Billman, upon which the Knight court relied, it appears the mother asserted her Fifth Amendment rights after she was sworn in and the trial court overruled her objection.
 {¶ 46} We find the matter at hand analogous to In the Matter ofMyers, Seneca App. No. 13-06-48, 2007-Ohio-1631. Myers concerned the adjudication of the appellant's 13-year-old daughter to be a dependent minor child pursuant to R.C. 2151.04(C). During the adjudication hearing, the Seneca County Department of Job and Family Services ("SCDJFS") called Myers to testify on cross-examination. Though he raised the Fifth Amendment protection against self-incrimination to avoid being called as a witness, the trial court overruled his objection and permitted SCDJFS to call him as a witness. Once sworn in, Myers answered some questions, but raised the Fifth Amendment protection to the majority. Arguing the trial court violated his Fifth Amendment rights when permitting SCDJFS to call him as a witness during the adjudication hearing, Myers, like C.G., Sr., relied on Knight andBillman.
 {¶ 47} The Myers court, relying on Tedeschi, supra, held that although he asserted his Fifth Amendment protection, the "Fifth Amendment protection against self- *Page 21 
incrimination did not permit Myers to completely refuse to testify." Id. at ¶ 33 (emphasis sic), citing In re Shrider, Wyandot App. No. 16-05-20,2006-Ohio-2792, and Billman. The court in Myers also noted that the trial court did not, at any time, compel Myers to answer any questions. See, also, Tedeschi, at 111 (stating "[w]hile the umbrella ofFifth Amendment guarantees is broad, the prohibition against compulsory testimony does not relieve a party from appearing or answering questions in a civil action."); In the Matter of Zahler (June 23, 1995), Lake App. No. 94-L-091 ("A witness's privilege against self-incrimination is clearly not co-extensive with a defendant's right not to take the stand."); In re Rebecca S. (Oct. 31, 1997), Lucas App. No. L-96-377 (relying on Cooper and Dinsio, holding that where a court has prior knowledge that a witness will exercise his right not to testify, the court must nevertheless permit counsel to call such witness to the stand as the court has no power to prohibit a witness from taking the stand based solely on the knowledge that the witness will refuse to testify).
 {¶ 48} Like Myers, C.G., Sr.'s assertion of his Fifth Amendment protection against self-incrimination did not permit him to completely refuse to testify. Though permitting him to be called as a witness, the trial court did not compel C.G., Sr. to answer any questions. Rather, after asserting the Fifth Amendment in response to numerous questions, the magistrate inquired if it was his intention to assert hisFifth Amendment right to remain silent to each and every question. When C.G., Sr. responded that it was, the magistrate allowed him to step down. *Page 22 
 {¶ 49} Based on the foregoing, we cannot find that the trial court violated C.G., Sr.'s Fifth Amendment right against self-incrimination when it permitted FCCS to call him as a witness on cross-examination during the adjudication hearing. Consequently, we overrule C.G., Sr.'s third assignment of error.
 {¶ 50} C.G., Sr.'s fourth, K.G.'s first, and C.G. and M.G.'s second assignments of error all challenge the trial court's finding of M.E.G. to be an abused, dependent and neglected minor child, and the finding of C.G., M.G., and D.G. to be dependent minor children and argue such finding was against the manifest weight of the evidence.
 {¶ 51} That a child is an abused, neglected, or dependent minor must be established by clear and convincing evidence. R.C. 2151.35(A). Clear and convincing evidence is that measure or degree of proof which is more than a mere preponderance of the evidence, but does not reach the extent of the certainty required to establish "beyond a reasonable doubt" in criminal cases. It is that quantum of evidence which will produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established. Cross v. Ledford (1954), 161 Ohio St. 469. When reviewing a trial court's decision on a manifest weight of the evidence basis, we are guided by the presumption that the findings of the trial court were correct. In re Williams, Franklin App. No. 01AP-867, 2002-Ohio-2902. The weight to be given the evidence and the credibility of the witnesses are primarily for the trier of fact.State v. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus. The rationale for this presumption is that the trial court is in the best position to evaluate the evidence by viewing witnesses and observing their *Page 23 
demeanor, voice inflections, and gestures. Seasons Coal Co. v.Cleveland (1984), 10 Ohio St.3d 77. Thus, judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence. C.E. Morris Co. v. Foley ConstructionCo. (1978), 54 Ohio St.2d 279, paragraph one of the syllabus.
 {¶ 52} In the present case, the trial court found there existed clear and convincing evidence that M.E.G. was an abused, neglected, and dependent child pursuant to R.C. 2151.031, 2151.03, and 2151.04, respectively, and that C.G., M.G., and D.G. are dependent children pursuant to R.C. 2151.04. We will first review the adjudication of M.E.G.
 {¶ 53} R.C. 2151.031 provides in part:
 As used in this chapter, an "abused child" includes any child who:
 (A) Is the victim of "sexual activity" as defined under Chapter 2907. of the Revised Code, where such activity would constitute an offense under that chapter, except that the court need not find that any person has been convicted of the offense in order to find that the child is an abused child[.][2] *Page 24 
 {¶ 54} R.C. 2151.03, provides in pertinent part:
 (A) As used in this chapter, "neglected child" includes any child:
 (2) Who lacks adequate parental care because of the faults or habits of the child's parents, guardian, or custodian[.]
 {¶ 55} R.C. 2151.04 provides in pertinent part:
 As used in this chapter, "dependent child" means any child:
 (C) Whose condition or environment is such as to warrant the state, in the interests of the child, in assuming the child's guardianship[.]
 {¶ 56} Appellants contend that M.E.G.'s credibility is undeniably suspect and that it is not possible for the abuse to have occurred as M.E.G. described because the time frames are particularly strained. C.G., Sr. also suggests the lack of physical evidence and first-hand witness testimony to substantiate M.E.G.'s allegations renders her testimony suspect.
 {¶ 57} We agree that the bulk of the evidence consists of M.E.G.'s testimony, as there is neither physical evidence nor any witness to the alleged abuse. Initially, we note that while physical evidence would strengthen reliability of M.E.G.'s testimony, a lack of physical evidence is not uncommon in physical abuse cases. In re A.R., Summit App. *Page 25 
No. 22836, 2006-Ohio-1548; In re Moonshower, Van Wert App. No. 15-04-04,2004-Ohio-4024. Additionally, as noted by the magistrate, it is not uncommon that there are no witnesses to these occurrences since they are rarely public and often only the abuser and the victim are present.
 {¶ 58} With respect to M.E.G.'s credibility, the magistrate cited to previous untruths told by M.E.G. regarding a PlayStation, drawings, the ability to read fast, a poem, and a stolen book at school. The magistrate noted that M.E.G. testified about these incidents in court, and that such untruths were not atypical for a child of M.E.G.'s age. The magistrate went on to state that M.E.G. was unwavering and consistent as to what C.G., Sr. did to her. In its decision overruling the objections to the magistrate's decision, the trial court agreed that M.E.G.'s untruths were normal behavior for children and that they were unrelated to the matter at hand. The trial court also noted M.E.G.'s consistent testimony with respect to the allegations against C.G., Sr., even during vigorous cross-examination at trial.
 {¶ 59} Appellants also challenge M.E.G.'s timeline of events surrounding the alleged incidents of abuse. Specifically, appellants contend the events described by M.E.G. could not have occurred during the 30-minute intervals M.E.G. stated she was alone with her father. M.E.G. testified she would get home from school around 3 p.m., would put in a DVD in her parents' bedroom, fall asleep, and wake to find her father touching her. M.E.G. also testified that she was responsible for getting her younger siblings at the bus stop, which would be approximately 3:30 p.m. The trial court *Page 26 
discussed the strained nature of the days and times the abuse occurred. During oral argument on appeal, the state even conceded that M.E.G.'s timeline was constrained, but argued such is not unusual in sexual abuse cases involving children. The trial court addressed this issue as it was raised in the objections before it, and because of the multiple brief incidents involved, the trial court did not find that the short time periods made M.E.G. a witness that is not credible. Despite the constrained timeline of events, it is clear the trial court found the testimony of M.E.G. to be credible, and we cannot disagree with the trial court's assessment of these facts.
 {¶ 60} Appellants also challenge M.E.G.'s testimony surrounding when the abuse began. M.E.G. testified the first incident happened sometime prior to Thanksgiving while her mother was at work. According to Ms. Fournier, M.E.G. said the first incident happened two days prior to Thanksgiving. Since timesheet records established that K.G. was not at work the week of Thanksgiving, appellants contend the abuse could not have occurred as M.E.G. described. Again, this inconsistency was presented to the trial court, and the trial court found M.E.G. a credible witness despite the same. The trier of fact is in the best position to view the testimony and weigh the credibility of witnesses by observing their demeanor. Seasons Coal, supra.
 {¶ 61} This is clearly a case that centers on the victim's allegations. The trial court weighed the credibility of the witnesses, including the testimony of all the witnesses, and clearly determined that M.E.G.'s testimony was reliable. The trial court was in the best position to view the testimony and weigh credibility. We find no error in the trial court's *Page 27 
finding of M.E.G. to be credible. Once found to be credible, there is no question M.E.G. fits within the definition of an abused, neglected, and dependent child.
 {¶ 62} Regarding the adjudication of M.G., C.G., and D.G. to be dependent minor children, we find that through establishing that M.E.G. had been sexually abused by her father, the state provided sufficient evidence to allow the trial court to find by clear and convincing evidence that the elements of R.C. 2151.04(C) were met. Accordingly, we overrule C.G., Sr.'s fourth, K.G.'s first, and C.G. and M.G.'s second assignments of error.
 {¶ 63} Lastly, we turn to K.G.'s second assignment of error, which asserts that the cumulative effect of the trial court's errors substantially compromised her substantive and procedural rights. Having previously determined that no multiple instances of harmless error occurred, we cannot find cumulative error. Consequently, we overrule K.G.'s second assignment of error.
 {¶ 64} For the foregoing reasons, C.G., Sr.'s four assignments of error are overruled, K.G.'s two assignments of error are overruled, C.G. and M.G.'s two assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch is hereby affirmed.
Judgment affirmed.
BRYANT and BROWN, JJ., concur.
[1] For purposes of anonymity, both first and last names of the minor children and the parents are designated throughout this opinion by initials only.
[2] R.C. 2907.01, provides:
 (A) "Sexual conduct" means vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another. Penetration, however slight, is sufficient to complete vaginal or anal intercourse.
 (B) "Sexual contact" means any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person.
 (C) "Sexual activity" means sexual conduct or sexual contact, or both. *Page 1