[Cite as *In re N.L.*, 2020-Ohio-166.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

In the Matter of:                                    :

[N.L.],                                              :

[R.L.,                                               :

                    Appellant].              :

No. 19AP-397
(C.P.C. No. 17JU-8751)

(ACCELERATED CALENDAR)

D E C I S I O N

Rendered on January 21, 2020

**On brief:** *Anzelmo Law,* and *James A. Anzelmo*, for appellant.

**On brief:** *Robert J. McClaren*, for appellee, Franklin County Children Services.

APPEAL from the Franklin County Court of Common Pleas
Division of Domestic Relations, Juvenile Branch

BRUNNER, J.

{¶ 1} Appellant, R.L., biological father of the child, N.L., who is the subject of proceedings for permanent child custody, from which this appeal is taken, appeals a decision by the Domestic Relations Division, Juvenile Branch of the Franklin County Court of Common Pleas entered on May 24, 2019 granting permanent custody of his biological child, N.L., to Franklin County Children Services ("FCCS"). Because R.L.'s trial counsel did not object to the introduction of testimony by the guardian ad litem ("GAL") and R.L. essentially adopted that testimony, there was no plausible basis for excluding the GAL's testimony. Thus, we overrule R.L.'s first assignment of error. Because we also find that the trial court's conclusions in weighing the factors set forth in R.C. 2151.414 were not against the manifest weight of the evidence, we affirm the grant of permanent custody to FCCS.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 2} N.L. was born in April 2017. (July 10, 2017 Compl. at 1; Tr. at 12, filed Sept. 6, 2019.) At birth, N.L. weighed 3 pounds and 5 ounces and both he and his mother tested

positive for cocaine, opiates, and methadone.  (July 10, 2017 Compl. at 1; Tr. at 16.) Consequently, on July 10, 2017, FCCS filed a complaint alleging that N.L. was an abused, neglected, and dependent child.  (July 10, 2017 Compl.)

{¶ 3}   A temporary custody order issued in favor of FCCS on July 11, 2017.  (July 11, 2017 Mag. Order.)   Because N.L. had remained in the neonatal intensive care unit for several months after his birth, the result of this order was that N.L. was released from the hospital directly into the care of a foster family and has never lived with his biological mother (A.S.) or father (the appellant, R.L.).  (Tr. at 22, 39.)  Shortly after the temporary custody order issued, on July 17, the court appointed a GAL for N.L.  (July 17, 2017 Mag. Order.)  Two months later, the court substituted a new GAL for the previous GAL.  (Sept. 14, 2017 Mag. Order.)   That GAL remained in place throughout the life of the case, ultimately filing two reports relating N.L.'s status and prospects.  (Oct. 2, 2017 GAL Report; April 30, 2019 GAL Report.)

{¶ 4}   Three months after the initial custody order, the court adjudicated N.L. to be an abused, neglected, and dependent child.  (Oct. 10, 2017 Jgmt. Entry.)  On June 8, 2018, FCCS filed the first motion for permanent custody of N.L. essentially alleging that A.S. and R.L. were drug addicts who had abandoned N.L. by failing to visit N.L. or comply with substantially any portion of the case plan.  (June 8, 2018 PCC Mot. at 4-5.)  In December 2018, FCCS filed a second motion alleging many of the same grounds and adding that A.S. had since given birth to another child who also tested positive at birth for opiates and cocaine.  (Dec. 11, 2018 2d PCC Mot. at 4-6.)

{¶ 5}   On May 7, 2019, the trial court held a hearing on the question of permanent custody.  (Tr. at 1.)  Neither of N.L.'s biological parents appeared on time for the hearing. (Tr. at 4-11.)  N.L.'s mother, A.S., never appeared for any part of the hearing, reporting through her attorney that she was in the hospital for a leg infection.  (Tr. at 4-10.)  But A.S. never produced any proof or documentation to support this excuse.  *Id.*  R.L. arrived during the testimony of the first witness.  (Tr. at 19.)

{¶ 6}   The first witness called by FCCS was the caseworker for N.L.'s case.  She confirmed that N.L. was born at 33 weeks' gestation with cocaine and various opioids in his system and that the first several months of N.L.'s life were spent in a neonatal intensive care unit.  (Tr. at 16-17, 39.)  She said that A.S. and R.L. rarely visited N.L. in the hospital and

that, due to substance abuse concerns, FCCS had sought and received temporary custody of N.L. while he was still in the hospital.  (Tr. at 18, 20-21.)  The upshot of this, explained the caseworker, was that N.L. had been continuously in the custody of FCCS since July 10, 2017.  (Tr. at 22.)

{¶ 7}  The caseworker laid out the case plan objectives that would, if completed, have permitted reunification.  Essentially, these were that the parents were to complete random drug screens, to submit to an alcohol and drug assessment, to follow the recommendations of that assessment, to maintain verified employment, to obtain stable and verifiable housing, and to submit to mental health assessments.  (Tr. at 23, 79-80.)  Both parents admitted that their housing situation was not suitable for N.L.  (Tr. at 27-28, 86.)  Neither parent completed even a single drug screen and neither submitted to the alcohol and drug assessment.  (Tr. at 29, 34.)  Neither parent took any steps toward submitting to a psychological evaluation.  (Tr. at 34.)  Though R.L. generally was employed, verification of that fact was inconsistent.  (Tr. at 28-29.)  Finally, as of the time of the hearing in May 2019, the last time R.L. had visited N.L. was December 20, 2017.  (Tr. at 34-35.)  A.S. had not visited since September 18, 2018.  *Id.*  Visits were permitted and all either parent had to do to obtain a visit was to call and schedule one.  (Tr. at 35.)  In short, despite attempts by FCCS to contact the parents at least every 60 days, the parents failed to respond and neither parent met substantially any of the case plan objectives.  (Tr. at 50, 83-84, 93-94.)

{¶ 8}  The caseworker stated that she made contact with some relatives of R.L. but that none were willing and able to take custody of N.L.  (Tr. at 38-39.)  However, the caseworker also testified that N.L. had been in the same foster home since his discharge from the neonatal intensive care unit, that he had bonded with his foster parents (referring to them as "momma" and "dada") and the other children in the home.  (Tr. at 39.)  The caseworker testified that N.L.'s younger sister also lived in the foster home as of the time of hearing and that N.L. referred to her as "baby" and gave her kisses.  (Tr. at 41.)  According to the caseworker, the foster parents were willing to adopt both N.L. and his little sister.  (Tr. at 40.)

{¶ 9}  The GAL testified that he had visited N.L. consistently at his foster parents' home and that N.L. appeared to regard his foster parents as his true parents.  (Tr. at 111-

12.)  He admitted that he never observed a visit between N.L. and R.L. (or A.S.) because the visits were so infrequent.  (Tr. at 112-13.)  As he put it, "So due to basically no visitation between either parent, I have not been able to see [N.L.] interact with biological parents." (Tr. at 113.)  He opined that N.L. was too young, as of the time of hearing, to articulate his wishes.  (Tr. at 117.)  But based on observing N.L. in his foster home, the GAL stated that it was unlikely that N.L. would wish to leave his foster family.  (Tr. at 117.)  In summing up, the GAL noted that both N.L. and his younger sister were born positive for drugs and that both A.S. and R.L. had completely failed to screen or even register for drug screening.  (Tr. at 118-21.)   According to the GAL, after two years with no progress, N.L.'s need for permanence justified a grant of permanent custody to FCCS.  *Id.*

{¶ 10} R.L. testified twice, once as on cross, and once on direct during the presentation of his own case.  (Tr. at 98, 123.)  He testified that A.S. is his wife and had been married since 2012.  (Tr. at 99.)  He admitted that he and A.S. were still living in unsuitable housing and that neither of them could take care of N.L. as of the hearing date.  (Tr. at 99-101, 129-30, 152-57.)  R.L. also implied that he had "no real objections" to N.L. being in the custody of the foster parents:

> Q.   Do you love [N.L.]?
>
> A.   I really don't know [N.L.]
>
> Q.   But do you want to have him in your custody?
>
> A. I'm not -- I mean, like I said before, I have no real objections –
>
> Q.      Could -
>
> A.     - they're great people.

(Tr. at 132.)  In answer to questions from his attorney, R.L. stated that he did not want N.L. out of his life.  *Id.*  Yet, he later further admitted that he wanted to make an unselfish decision for N.L. and that the foster parents were doing a better job than he could do.  (Tr. at 154-55.)  R.L. admitted that A.S. had a problem with drugs and also that he, himself, refused to submit to drug testing at the time of hearing on the grounds that he would test positive.  (Tr. at 101-06, 125-26.)  R.L. also endorsed the testimony of the GAL, stating that "everything he said is correct."  (Tr. at 144.)

{¶ 11} On May 24, 2019, the trial court issued a judgment entry granting permanent custody of N.L. to FCCS. (May 24, 2019 Jgmt. Entry.) The trial court found that N.L. had been abandoned, that no other suitable relative could take custody, and N.L.'s biological parents had failed to successfully complete any essential components of the case plan. *Id.* at 8-11.

{¶ 12} R.L. now appeals.

## II. ASSIGNMENTS OF ERROR

{¶ 13} R.L. presents two assignments of error for review:

> [1.] The trial court plainly erred by admitting the testimony of the guardian ad litem.

> [2.] Children services failed to establish, by clear and convincing evidence, that it should be given permanent custody of N.L.

## III.  DISCUSSION

### A. First Assignment of Error - Whether the Trial Court Plainly Erred in Admitting the GAL's Testimony

{¶ 14} R.L. argues that, although his counsel did not object to the GAL offering testimony in this case and although he testified that "everything" the GAL said was "correct," we should find that the GAL should not have been permitted to testify. (R.L.'s Brief at 5-7; Tr. at 144.) He bases this argument on the notion that the GAL insufficiently investigated the case and that allowing his testimony without the foundation of robust investigation constitutes civil plain error. (R.L.'s Brief at 5-7.) *See State v. Morgan*, 153 Ohio St.3d 196, 2017-Ohio-7565, ¶ 37-40.

{¶ 15} The Ohio Rules of Evidence provide only one potential basis to exclude the GAL's testimony:

> A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may, but need not, consist of the witness' own testimony.

Evid.R. 602. The GAL in this case presented evidence that he had personal knowledge of N.L.'s situation. He testified that for the nearly two years in which he had been GAL for N.L., he had visited regularly at the foster home and had seen him grow from a baby into a

two-year-old toddler. (Tr. at 111-12.) The GAL testified that he had observed the interactions, had observed that the foster parents' household was the only home N.L. had ever known. *Id.* Based on that personal knowledge, he offered a lay opinion that N.L., a two-year-old child, would not want to be removed from the only home and the only parents he had ever known. (Tr. at 117.) The GAL did not attempt to opine about matters of which he had no knowledge and testified clearly that he could provide no information about the nature of N.L. and R.L.'s interaction because visits were so infrequent that he had never had the opportunity to witness one. (Tr. at 112-13.) Nothing about the GAL's testimony suggests that he should have been prohibited from testifying.

{¶ 16} Moreover, even if there had been some basis on which to exclude the GAL's testimony, R.L. does not explain how he was unfairly prejudiced by it or why the failure to exclude it would not have been harmless. Civ.R. 61; *see Cahill v. Owens*, 10th Dist. No. 15AP-925, 2016-Ohio-4972, ¶ 22, quoting *Hayward v. Summa Health Sys.*, 139 Ohio St.3d 238, 2014-Ohio-1913, ¶ 25 ("We examine whether 'without th[at] error[]' the factfinder 'probably would not have arrived at the same verdict.' "). R.L. himself plainly admitted that "everything" the GAL said was "correct," that N.L. was thriving in foster care, that he and his wife could not take care of N.L., and that he had not visited N.L. since December 2017. (Tr. at 107, 132, 144, 152-57.) According to this evidence, admitting the GAL's testimony was not prejudicial to R.L.'s chances of obtaining custody of his son, especially in the circumstance as here where R.L. plainly admitted that the GAL's testimony was correct.

{¶ 17} We overrule R.L.'s first assignment of error.

**B. Second Assignment of Error - Whether the Trial Court Erred in Granting Permanent Custody of N.L. to FCCS**

{¶ 18} When proceeding under R.C. 2151.414(B)(1), a decision to award permanent custody requires the trial court to take a two-step approach. First, the trial court must find whether any of the following apply:

> (a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an

equivalent agency in another state, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

(b) The child is abandoned.

(c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.

(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state.

(e) The child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state.

R.C. 2151.414(B)(1)(a) through (e).

{¶ 19} Once the trial court finds that at least one of these circumstances applies, the trial court then must determine whether, "by clear and convincing evidence," the movant has shown that a grant of permanent custody is in the "best interest of the child." R.C. 2151.414(B)(1). Clear and convincing evidence is that degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the facts to be established. *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus. It is more than a mere preponderance of the evidence but does not require proof beyond a reasonable doubt. *Id.*

{¶ 20} In this case, R.L. forthrightly admitted that he had not visited N.L. since Christmas 2017, a period of more than 16 months. (Tr. at 107.) This constitutes presumptive abandonment. *See* R.C. 2151.011(C) ("[A] child shall be presumed abandoned when the parents of the child have failed to visit or maintain contact with the child for more than ninety days, regardless of whether the parents resume contact with the child after that period of ninety days."); *see also* R.C. 2151.414(B)(1)(b). It is also undisputed that N.L. had

been in the continuous custody of FCCS since July 10, 2017. (Tr. at 22.) R.C. 2151.414(B)(1)(d).[1]

{¶ 21} As an alternative to abandonment or length of time in FCCS' custody, the trial court also discussed the alternative ground of R.C. 2151.414(B)(1)(a)—where (when neither abandonment nor length of custody applies) "the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents." (May 24, 2019 Jgmt. Entry at 10.) When one of the factors listed in R.C. 2151.414(E) are satisfied, "the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent." R.C. 2151.414(E). In this case, the trial court found divisions (E)(1), (E)(4), and (E)(10) satisfied with respect to R.L. (May 24, 2019 Jgmt. Entry at 10.) That is, the trial court found that N.L.'s parents had continuously failed to remedy the conditions that caused N.L.'s removal in the first place, had demonstrated a lack of commitment to N.L. by failing to attempt to remedy these conditions, and had abandoned N.L. *Id.* We discern no error in these conclusions. Further, R.L. candidly testified that neither he nor his wife could care for N.L. as of the hearing date and the other evidence showed that in the two years the case had been pending neither parent had made any significant effort to comply with the case plan or even visit their child. (Tr. at 27-29, 34-35, 50, 83-86, 93-94, 99-101, 107, 113, 118-21, 129-32, 152-57.)

{¶ 22} The trial court did not err in finding the first portion of R.C. 2151.414(B)(1) to be satisfied and therefore properly turned to consider whether it was "in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody." *Id.* R.C. 2151.414(D) sets forth relevant factors to consider in determining the best interests of the child:

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

---

[1] Because FCCS did not seek to proceed under R.C. 2151.414(B)(1)(d), the trial court merely noted it as a possible additional justification. (May 24, 2019 Jgmt. Entry at 10-11.)

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

R.C. 2151.414(D)(1)(a) through (e). The additional factors referenced in R.C. 2151.414(D)(1)(e) are:

(7) The parent has been convicted of or pleaded guilty to one of [a number of offenses apparently inapplicable in this case].

(8) The parent has repeatedly withheld medical treatment or food from the child when the parent has the means to provide the treatment or food, and, in the case of withheld medical treatment, the parent withheld it for a purpose other than to treat the physical or mental illness or defect of the child by spiritual means through prayer alone in accordance with the tenets of a recognized religious body.

(9) The parent has placed the child at substantial risk of harm two or more times due to alcohol or drug abuse and has rejected treatment two or more times or refused to participate in further treatment two or more times after a case plan issued pursuant to section 2151.412 of the Revised Code requiring treatment of the parent was journalized as part of a dispositional order issued with respect to the child or an order was issued by any other court requiring treatment of the parent.

(10) The parent has abandoned the child.

(11) The parent has had parental rights involuntarily terminated with respect to a sibling of the child pursuant to this section or section 2151.353 or 2151.415 of the Revised Code, or under an existing or former law of this state, any other state, or

> the United States that is substantially equivalent to those sections, and the parent has failed to provide clear and convincing evidence to prove that, notwithstanding the prior termination, the parent can provide a legally secure permanent placement and adequate care for the health, welfare, and safety of the child.

R.C. 2151.414(E)(7) through (11).

{¶ 23} In reviewing a trial court's decision as to whether the statutory elements are satisfied in a permanent custody case, we use a manifest weight of the evidence standard. *In re M.E.G.*, 10th Dist. No. 06AP-1256, 2007-Ohio-4308, ¶ 51; *In re G.S.*, 10th Dist. No. 05AP-1321, 2006-Ohio-2530, ¶ 4. In the time since *In re M.E.G.* and *In re G.S.* were decided, the Supreme Court of Ohio has "carefully distinguished the terms 'sufficiency' and 'weight,' " even in civil cases, "declaring that 'manifest weight' and 'legal sufficiency' are 'both quantitatively and qualitatively different.' " *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 10, in passim, quoting *State v. Thompkins*, 78 Ohio St.3d 380 (1997), paragraph two of the syllabus.

> Weight of the evidence concerns "the inclination of the *greater amount of credible evidence*, offered in a trial, to support one side of the issue rather than the other. * * * Weight is not a question of mathematics, but depends on its *effect in inducing belief*."

(Emphasis sic.) *Eastley* at ¶ 12, quoting *Thompkins* at 387; *Black's Law Dictionary* 1594 (6th Ed.1990).

### 1. Factor (D)(1)(a) – Relationship Between N.L. and Biological Father, Siblings, and Foster Parents

{¶ 24} By R.L.'s own admission, he and N.L. do not have a relationship. (Tr. at 132.) The GAL and caseworker testified that N.L. is thriving in the care of his foster parents (the only parents he has ever known) whom he refers to as "momma" and "dada." (Tr. at 39, 111-12.) His younger sister is placed with the family also and he appears bonded to her referring to her as "baby" and giving her kisses. (Tr. at 41.)

{¶ 25} The trial court's discussion on this factor shows it considered evidence that is capable of inducing belief and that supports its conclusions that granting permanent custody to FCCS is in the best interest of N.L. (May 24, 2019 Jgmt. Entry at 9.) In short,

we find that the trial court's findings concerning what was in the best interest of N.L. were not against the manifest weight of the evidence and we discuss them more fully as follows.

### 2. Factor (D)(1)(b) – The Wishes of N.L.

{¶ 26} N.L.'s very young age did not permit him to verbally articulate his wishes. (Tr. at 117.)  The record shows that the foster parents' household was the only home N.L. had ever known.  (Tr. at 111-12.)  The GAL offered a reasonable lay opinion that N.L., a two-year-old child, would not want to be removed from the only home and the only parents he has ever known.  (Tr. at 117.)  The trial court accurately noted that N.L. was too young to articulate his wishes.  (May 24, 2019 Jgmt. Entry at 9.)  Nevertheless it noted that, in light of the GAL's testimony and the other facts of the case, it was reasonable to conclude that N.L.'s wish, could it have been articulated, would have been to stay with his foster parents and be adopted.  *Id.*  The trial court's findings on this factor are not against the manifest weight of the evidence.

### 3. Factor (D)(1)(c) – N.L.'s Custody History

{¶ 27} It is undisputed that N.L. was in the custody of the agency from July 10, 2017, through the time of hearing in May 2019.  (Tr. at 22.)  That is "twelve or more months of a consecutive twenty-two-month period," as contemplated in R.C. 2151.414(D)(1)(c).

{¶ 28} It was therefore not against the manifest weight of the evidence for the trial court to have concluded that the record clearly and convincingly showed that N.L.'s history with the agency militated in favor of granting the motion for permanent custody.

### 4. Factor (D)(1)(d) – N.L.'s Need for Secure Placement and Whether that can be Achieved Without Granting Custody to FCCS

{¶ 29} N.L., who was born in April 2017, and who was taken directly from the neonatal intensive care unit to his foster home, had been in agency custody his entire life at the time of the hearing in May of 2019.  (Tr. at 16-17, 22, 39.)  Neither of his parents showed any interest in completing virtually any aspect of the case plan that might have resulted in reunification.  (Tr. at 50, 83-84, 93-94.)  Both struggled with what clearly appeared to be drug addiction.  (Tr. at 20-21.)  The evidence also showed that, at the time of the hearing, N.L. was in a foster home with a family that wanted to adopt him permanently and he was thriving in that environment.  (Tr. at 39-41, 111-12.)

{¶ 30} The trial court stated the evidence on this factor supporting its finding that N.L. was in need of legally secure permanent placement that could not be achieved without

granting permanent custody to FCCS. We note from the record and the domestic court's decision that this conclusion was especially accurate in light of the fact that N.L.'s biological parents were not making sufficient progress to alleviate the symptoms of their apparent drug addictions and resulting inadequacies in their ability to parent N.L. Thus, this was not against the manifest weight of the evidence. (May 24, 2019 Jgmt. Entry at 9.)

### 5. Factor (E)(7) – Convictions of Parents

{¶ 31} There was no evidence that any parent committed any of the relevant offenses in this case. Thus, the trial court correctly did not discuss this factor. (May 24, 2019 Jgmt. Entry at 9.)

### 6. Factor (E)(8) – Withholding Food or Medical Treatment

{¶ 32} Our review of the record shows that this factor was inapplicable and that the trial court correctly did not discuss it. (May 24, 2019 Jgmt. Entry at 9.)

### 7. Factor (E)(9) – Risk of Harm from Drug or Alcohol Abuse

{¶ 33} There was evidence that both parents used drugs and had never engaged or even registered for drug screening. (Tr. at 29, 34, 118-21.) Yet, there was no evidence that R.L. (who has never had custody of N.L.) "placed [N.L.] at substantial risk of harm two or more times due to alcohol or drug abuse." R.C. 2151.414(E)(9). Consequently, the trial court was correct to have failed to find this factor. (May 24, 2019 Jgmt. Entry at 9.)

### 8. Factor (E)(10) – Whether N.L. has been Abandoned

{¶ 34} R.L. abandoned N.L. when he failed to visit him for a period that was, at the time of trial, more than 16 months. (Tr. at 107.) R.C. 2151.011(C). Although the trial court was technically incorrect in stating that no evidence was presented on any of the (E)(7) through (11) factors, it elsewhere discussed abandonment and correctly determined that N.L. was abandoned. (May 24, 2019 Jgmt. Entry at 8.) Thus, the trial court's failure to repeat that finding with respect to division (E)(10) of R.C. 2151.414 is at worst harmless oversight. Civ.R. 61.

### 9. Factor (E)(11) – Whether Parents have had Parental Rights Involuntarily Terminated with Respect to a Sibling of N.L.

{¶ 35} There was evidence at trial that both A.S. and R.L. have several other children, none of whom reside with them, and evidence was not introduced to prove that their parental rights had been involuntarily terminated. (Tr. at 44-49, 109.) Thus, the trial court did not err in failing to address this issue.

**10. Overall Weighing of the Factors and the Best Interest of N.L.**

{¶ 36} At the time of permanent custody hearing, R.L. had not seen his son for more than 16 months. Visitations were permitted. All he had to do was telephone FCCS and schedule one. But he did not. He never submitted himself for a single drug screen (did not at any time even sign up to be screened). Nor did R.L. make any significant effort to complete any other case plan objective. In fact, he candidly admitted that he could not take custody of N.L. as of the hearing date and that N.L. was better off with his foster family. N.L.'s mother, A.S., had also gone many months without visiting N.L., also never even signed up for drug screens, and also never completed any of the case plan objectives. She also did not appear for the permanent custody hearing and did not in any way substantiate her alleged medical excuse for failing to appear.

{¶ 37} Under these circumstances, it was not against the manifest weight of the evidence for the trial court to have concluded that, by clear and convincing proof, awarding permanent custody to FCCS was the appropriate outcome. Not only did the trial court not err significantly in its recitation on any individual factor, it also did not err in weighing them to reach the ultimate result. Accordingly, R.L.'s second assignment of error is overruled.

## IV. CONCLUSION

{¶ 38} Trial counsel did not object to the introduction of testimony by the GAL and R.L. essentially adopted that testimony, stating that "everything" the GAL said was "correct." There was no plausible basis for excluding the GAL's testimony and no potential for unfair prejudice resulted from its introduction. The trial court did not err prejudicially in considering and weighing the factors set forth in R.C. 2151.414 and its resulting conclusions were not against the manifest weight of the evidence. We affirm the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch in the granting of permanent custody to FCCS.

*Judgment affirmed.*

DORRIAN and LUPER SCHUSTER, JJ., concur.