[Cite as *Cahill v. Owens*, 2016-Ohio-4972.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Edward Cahill, | : | |
| Plaintiff-Appellant, | : | |
| | | No. 15AP-925 |
| v. | : | (M.C. No. 2014 CVF-30099) |
| Jason Owens, et al., | : | (REGULAR CALENDAR) |
| Defendants-Appellees. | : | |

D E C I S I O N

Rendered on July 14, 2016

**On brief:** *The Fox Law Firm, LLC*, and *Justin M. Fox*, for appellant. **Argued:** *Justin M. Fox.*

APPEAL from the Franklin County Municipal Court

BRUNNER, J.

{¶ 1}   Plaintiff-appellant, Edward Cahill, appeals a judgment of the Franklin County Municipal Court filed on September 10, 2015, following a bench trial.   The judgment ordered defendant-appellee, Jason Owens, to pay $1,000 plus interest and costs and dismissed all of Cahill's other claims against both Owens and Owens' company, C & O Property Services ("C & O").   Because we find that the trial court erred in disposing of Cahill's unjust enrichment claim on the ground that Cahill failed to exercise "ordinary diligence," we reverse and remand for proceedings consistent with this decision.

I.  **FACTS AND PROCEDURAL POSTURE**

{¶ 2}   This case concerns the management and rental of a single-family residential home located on Belcher Drive in Columbus, Ohio.   On September 15, 2014, Cahill, who was allegedly attorney-in-fact for the owner of the property (his mother), filed a complaint against Owens and C & O alleging breach of contract, unjust enrichment, and fraud, all based on Owens' management of the property.   Owens and C & O answered on October 6,

No. 15AP-925

2014.  On August 27, 2015, the parties tried the case to the bench of the Franklin County Municipal Court.

{¶ 3}   Owens testified first in the trial as upon cross-examination.  He explained that he is a general contractor and part owner of C & O, and that he is licensed and bonded to do contracting work within the city of Columbus.  He also sometimes manages properties, collecting rent, and performing maintenance.  In the four and a half years that C & O has been in business, he has managed three properties, including Cahill's.

{¶ 4}   Owens testified that he first met Cahill at the beginning of July 2012 when Cahill asked him to finish a bathroom in a house Cahill was intending to let.  Owens finished the bathroom and Cahill paid Owens $2,000.00 for his work.   In the fall of that same year, Cahill contacted Owens again and asked him to repair a stoop at the same property.  Once again, Owens did the work and Cahill paid him, by Owens' reckoning, approximately $2,000.00.  Owens was also supposed to repair a window and was paid $1,000.00 for doing so, but admitted that he never repaired the window.  Owens testified that in addition to the $2,000.00 he received for finishing the bathroom, he charged Cahill's credit card a total of $4,000.68 for the stoop, the (uncompleted) window repair, and other miscellaneous repairs.

{¶ 5}   Owens later explained on direct examination that Cahill initially asked him to post an eviction notice, because the tenants of the house at the time of the stoop repair were behind in the payment of rent.  Owens testified that he posted the notice and then was contacted by the tenants.  The tenants said they had the necessary funds, and Owens relayed that information to Cahill who requested that Owens manage the property and make a lease with the tenants.  The agreement between Owens and Cahill, according to Owens' testimony on cross, was that Owens would collect rent from the tenants, take care of the property, keep 10 percent of the rent as a fee for managing the property, and forward the balance to Cahill.  In approximately 14 months as property manager, Owens collected $12,840 in rent and security deposit funds; yet, he never sent any of it to Cahill.  However, Owens testified that he and Cahill had an understanding that Cahill would only get money for rent to the extent that rent monies exceeded the value of the services Owens was providing in the upkeep of the property—as it turned out, Cahill never received any money, because the house needed considerable upkeep.  Owens admitted that he never

No. 15AP-925

billed Cahill for any services during the period in which he managed the property and only prepared invoices for the services he provided after the lawsuit was filed in the municipal court.

{¶ 6} The invoices were introduced into the record as exhibits at trial. The services and fees Owens documented in the invoices he prepared after suit was filed are as follows:

| | |
|---|---|
| [1.] Draft lease | $150.00 |
| [2.] Management fee | $1,144.00 |
| [3.] Lawn care at $75 per mow | $2,400.00 |
| [4.] Replace hot and cold shower valves | $250.00 |
| [5.] Replace locks, repair closet doors, replace porch light, install smoke detectors, deliver and install refrigerator, replace hot water shut-off valve for washer, repair main water shut-off valve, replace furnace gas valve, repair toilet, repair electrical outlets in bedrooms, repair hall light, replace hall light switch | $3,500.00 |
| [6.] Replace valve in kitchen faucet | $107.00 |
| [7.] Snow removal at $75 per visit | $2,700.00 |
| [8.] Furnace filter changes at $75 per visit | $375.00 |
| [9.] Leaf removal at $150.00 per visit | $450.00 |
| [10.] Drain cleaning at $200 per visit | $3,000.00 |

(Def.'s Exs. D1-D10, Aug. 27, 2015 Bench Trial.)

{¶ 7} Cahill testified after Owens. He explained that he is a truck driver who lives in North Carolina and rents the property at issue in his capacity as attorney-in-fact for his mother. Cahill testified that Owens was property manager from November 2012 to March 2014. Cahill testified that, according to his understanding, Owens' responsibilities as property manager were to inspect the property, and if something was wrong, to notify Cahill. He claimed that he hired Owens to evict the tenants and look after the property. He testified that he never gave Owens authority to enter into a lease on his behalf with the tenants, and he never agreed to pay for, or authorized Owens to perform any of the

services Owens provided during his term as property manager. Owens' compensation, according to Cahill, was to be 7 percent of rent. Cahill did acknowledge that he paid Owens for the stoop repairs and the window repair. However, of the $4,000.68 collected by Owens in credit card payments, $2,000.00, said Cahill, were unauthorized charges and the window work was never completed. Cahill testified the house drains were in good shape and that the tenants were provided with a new lawn mower; thus, there was no reason that he would have paid Owens for services like mowing the lawn or snaking drains.

{¶ 8} Cahill admitted that he did not see or check on the property from July 1, 2012, until June 15, 2015, the latter date being nine months after he filed the complaint against Owens that initiated this action. Under questioning from the trial judge, Cahill elaborated that he, in fact, thought the house was vacant beginning on or about the 15th of October 2012, when Owens first left the eviction notice on the door; Cahill did not learn the property was occupied until he had a security system installed on the premises and it sounded an alarm near the end of October or November 2013.

{¶ 9} The final witness who testified at trial was Douglas Carter, a tenant of the premises from July 2012 to June 2014. Carter testified that he helped Cahill renovate the house and moved in with his family on July 1, 2012. Before Owens became involved in managing the property, according to Carter, the relationship with Cahill as a landlord was very confused, and Carter had trouble getting Cahill to acknowledge when payments had been made or to agree on a system by which payments would be made. Carter testified that during the time in which Owens managed the property, he saw Owens probably twice a month or more often, that Owens promptly took care of any issues that arose on the property, and that Owens collected rent and always gave him a receipt. Carter testified that there was a lawn mower in a shed but that it was not new and did not work. He also explained that the shed was full of Cahill's stuff, and that Cahill promised he would clean it out so that Carter could use it for his own property care implements, but Cahill never did. Carter also testified that the sewer drain for the house was a repetitive problem. It back-flowed often and filled the basement with sewage containing human excrement and resulting in Carter having to discard items stored there such as clothing and Christmas

No. 15AP-925

presents. Carter testified that he had contacted Owens and the State of Ohio in an attempt to deal with the ongoing problem.

{¶ 10} Carter admitted that Cahill ultimately evicted him from the house and that, as part of an eviction proceeding, he agreed to pay Cahill $1,900 (which he had not paid as of the date of trial). Carter said, however, that he felt he was evicted even though he had the money at the time, because Cahill wanted Carter and his family out of the house so Cahill could sell the property.

{¶ 11} On September 10, 2015, the trial court issued a written decision dismissing all of Cahill's claims against Owens and C & O except that it required Owens to refund $1000 plus interest to Cahill as a result of having accepted money for repairing a window which, by his own admission, Owens never repaired.

{¶ 12} Cahill now appeals.

## II. ASSIGNMENTS OF ERROR

{¶ 13} Cahill assigns two errors for our review:

> 1. The Trial Court erred in not ordering disgorgement of $14,240.00 of rental proceeds collected by the Defendant/Appellee.
>
> 2. The Trial Court erred, as a matter of law, in finding that the Plaintiff's claims were unenforceable pursuant to the Statute of Frauds.

## III.  DISCUSSION

### A. First Assignment of Error–Whether the Trial Court Erred in Failing to Order Disgorgement of All Rental Proceeds Collected by Owens

#### 1.  Whether there was a Contract

{¶ 14} Cahill first assigns error to the trial court's judgment on the grounds that there was a contract between him and Owens and that the trial court erred in concluding that the management agreement lacked sufficiently definite terms and a mutual understanding.

{¶ 15} On several occasions the Supreme Court of Ohio has set forth the requirements of an enforceable contract:

> In *Kostelnik v. Helper*, 96 Ohio St.3d 1, 2002 Ohio 2985, 770 N.E.2d 58, we described the requirements for formation of a contract:

No. 15AP-925

> "A contract is generally defined as a promise, or a set of promises, actionable upon breach. Essential elements of a contract include an offer, acceptance, contractual capacity, consideration (the bargained for legal benefit and/or detriment), a manifestation of mutual assent and legality of object and of consideration."
>
> *Id.* at ¶ 16, quoting *Perlmuter Printing Co. v. Strome, Inc.*, 436 F.Supp. 409, 414 (N.D.Ohio 1976). We further explained that "[a] meeting of the minds as to the essential terms of the contract is a requirement to enforcing the contract." *Id.*, citing *Episcopal Retirement Homes, Inc. v. Ohio Dept. of Indus. Relations*, 61 Ohio St. 3d 366, 369, 575 N.E.2d 134 (1991). And to be enforceable, "the contract must be definite and certain." *Episcopal Retirement Homes* at 369, citing *James Ward & Co. v. Wick Bros. & Co.* 17 Ohio St. 159 (1867).

*Rayess v. Educational Comm. for Foreign Med. Graduates*, 134 Ohio St.3d 509, 2012-Ohio-5676, ¶ 19. Here, there is no written contract between Cahill and Owens; thus, the trial court was required to consider their testimony at trial to discern whether a contract existed, and if so, what its terms were.

{¶ 16} The testimony from Owens was to the general effect that he was engaged as a property manager of the house. This, according to Owens, meant that he was to take care of all maintenance and repairs, that he was entitled to 10 percent of the rent as a fee for undertaking the responsibility, and that the costs of the individual tasks would be billed against the rent collected. Cahill's testimony was that Owens was engaged for the limited purpose of evicting the current tenants, that he was only supposed to "manage" the property in the sense of inspecting it once in a while and letting Owens know about any problems, and that he was entitled to 7 percent of the rent total as a fee. As a preliminary matter, it is not clear how Owens was supposed to be paid under Cahill's version of the contract once he evicted the tenants and the house stood vacant (as Cahill testified he thought it was). Seven percent of zero rent is zero dollars. But aside from that observation, the testimony indicates that Owens and Cahill had very different ideas to what they were agreeing. They disagreed about the scope and type of responsibilities. They disagreed about the nature and amount of fees. They even failed to agree about the fundamental facts underlying the purported contract—whether the house was supposed to be occupied or not.

No. 15AP-925

{¶ 17} In reviewing the trial court's decision on this evidence, "[w]e are guided by the presumption that the jury, or the trial court in a bench trial, is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony and we afford great deference to the fact finder's determination of witness credibility." (Internal quotations marks omitted.) *State v. Westmoreland*, 10th Dist. No. 12AP-632, 2013-Ohio-1466, ¶ 13, quoting *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984); *In re B.K.*, 10th Dist. No. 12AP-343, 2012-Ohio-6166, ¶ 11; *State v. Cattledge*, 10th Dist. No. 10AP-105, 2010-Ohio-4953, ¶ 6, citing *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. Hearing the case in the posture of a bench trial, the trial court would, therefore, have been within its fact-finding discretion to believe one, both, or neither of the versions of the facts offered by Cahill and Owens.

{¶ 18} Though the trial court summarized the testimony offered by both Cahill and Owens in its decision, it did not expressly state whether it believed one witness over another or which facts it found to have been established by the testimony and other evidence. The trial court simply stated that, "The claimed property management contract before the Court lacks definite terms and a mutual understanding. It is unenforceable." (Sept. 10, 2015 Jgmt. Entry at 4.) Applying basic contract law to the evidence before it, the trial court essentially reached the conclusion that there was no enforceable contract between Owens and Cahill because of a lack of "definite terms and a mutual understanding." (*Id.*) Definite terms and mutual understanding are valid legal requirements of a contract; thus, the trial court did not err legally in referencing those concepts. *See, e.g., Rayess* at ¶ 19. Nor did the trial court abuse its discretion to determine the facts in this case and determine that they fell short of demonstrating a "meeting of the minds as to the essential terms of the contract" which was "definite and certain." *Id.*

### 2. Conversion

{¶ 19} Cahill's complaint did not assert a tort claim for conversion and neither the parties nor anyone else mentioned conversion at trial. In fact, not once in the complaint, the trial brief, Owens' deposition, or the entire trial transcript does the word "conversion" appear. It was not error for the trial court to have failed to find in Cahill's favor on a claim that was never once asserted in the case (but only in his brief on appeal). *Sabouri v. Ohio*

No. 15AP-925

*Dept. of Job & Family Servs.*, 145 Ohio App.3d 651, 654 (2001), citing *State ex rel. Quarto Mining Co. v. Foreman*, 79 Ohio St.3d 78, 81 (1997) (holding that a cause of action failed because it was not asserted in the trial court and was raised for the first time on appeal).

### 3. Unjust Enrichment

{¶ 20} The Supreme Court has explained:

> Unjust enrichment occurs when a person "has and retains money or benefits which in justice and equity belong to another," *Hummel v. Hummel* (1938), 133 Ohio St. 520, 528, 11 O.O. 221, 14 N.E.2d 923, while restitution is the "common-law remedy designed to prevent one from retaining property to which he is not justly entitled," *Keco Industries, Inc. v. Cincinnati & Suburban Bell Tel. Co.* (1957), 166 Ohio St. 254, 256, 2 O.O.2d 85, 141 N.E.2d 465. To establish a claim for restitution, therefore, a party must demonstrate "(1) a benefit conferred by a plaintiff upon a defendant; (2) knowledge by the defendant of the benefit; and (3) retention of the benefit by the defendant under circumstances where it would be unjust to do so without payment ('unjust enrichment')." *Hambleton v. R.G. Barry Corp.* (1984), 12 Ohio St.3d 179, 183, 12 OBR 246, 465 N.E.2d 1298.
>
> As this court has stated, the purpose of such claims "is not to compensate the plaintiff for any loss or damage suffered by him but to compensate him for the benefit he has conferred on the defendant." *Hughes v. Oberholtzer* (1954), 162 Ohio St. 330, 335, 55 O.O. 199, 123 N.E.2d 393.

*Johnson v. Microsoft Corp.*, 106 Ohio St.3d 278, 2005-Ohio-4985, ¶ 20-21.

{¶ 21} The trial court found that Cahill failed to exercise "due diligence" in discovering the claim for unjust enrichment and therefore was barred from asserting it. (Jgmt. Entry at 6.) However, as Cahill correctly observes, diligence is not an element of an unjust enrichment claim. Diligence was only discussed in the case cited by the trial court in connection with determining at what point the plaintiff should have been charged with knowledge of the claim such that the court should have concluded that it had accrued for purposes of the statute of limitations. *Hambleton v. R.G. Barry Corp.*, 12 Ohio St.3d 179, 181-82 (1984). No statute of limitations issue has been raised or is evident in this case. Thus, this conclusion by the trial court was error.

No. 15AP-925

{¶ 22} We are mindful that courts are generally required "at every stage of the proceeding[s]" to "disregard any error or defect in the proceeding which does not affect the substantial rights of the parties." Civ.R. 61. The Supreme Court has explained,

> In ascertaining whether prejudicial error exists, the court is "bound by the disclosures of the record." *Makranczy v. Gelfand*, 109 Ohio St. 325, 329, 2 Ohio Law Abs. 150, 2 Ohio Law Abs. 183, 142 N.E. 688 (1924). To find that substantial justice has not been done, a court must find (1) errors and (2) that without those errors, the jury probably would not have arrived at the same verdict. *Hallworth v. Republic Steel Corp.*, 153 Ohio St. 349, 91 N.E.2d 690 (1950), paragraph three of the syllabus.

*Hayward v. Summa Health Sys.*, 139 Ohio St.3d 238, 2014-Ohio-1913, ¶ 25. We examine whether "without th[at] error[]" the factfinder "probably would not have arrived at the same verdict." *Id.*

{¶ 23} In determining whether prejudicial error exists in the trial court's application of the equitable doctrine of unjust enrichment, the trial court appears to have found that Owens had received a benefit by retaining rent and also that Cahill had received an offsetting benefit by having his property cared for and maintained. However, the trial court's analysis was more in line with a laches[1] analysis as a defense in equity to

---

[1] We have previously quoted the Supreme Court on the doctrine of laches as follows:

> The doctrine of laches is based upon the *maxim vigilantibus non dormientibus jura subveniunt* (the laws aid the vigilant, and not those who slumber on their rights). In our unanimous opinion in *Connin v. Bailey* (1984), 15 Ohio St.3d 34, 35, 15 Ohio B. 134, 472 N.E.2d 328, we set forth the applicable law as follows:
>
> " 'Laches is an omission to assert a right for an unreasonable and unexplained length of time, under circumstances prejudicial to the adverse party. It signifies delay independent of limitations in statutes. It is lodged principally in equity jurisprudence.' "
>
> In order to invoke the doctrine, the following must be established:
>
> "Delay in asserting a right does not of itself constitute laches, and in order to successfully invoke the equitable doctrine of laches it must be shown that the person for whose benefit the doctrine will operate has been materially prejudiced by the delay of the person asserting his claim." *Smith v. Smith* (1959), 168 Ohio St. 447 [7 O.O.2d 276, 156 N.E.2d 113], paragraph three of the syllabus, approved and followed in Connin, supra, at 35-36. *Accord Kinney v. Mathias* (1984), 10 Ohio St.3d 72, 10 Ohio B. 361, 461 N.E.2d 901. The longstanding purpose of the doctrine is that a court will not aid in enforcing " ' * * * stale demands, where the party has slept upon his rights, or acquiesced for a great length of time. * * * ' " *Piatt*

unjust enrichment when it found Cahill did not exercise "due diligence." Because the trial court found that "due diligence" was necessary for proof for recovery, we are unable to find on review that the trial court would have reached the same result had it not made this finding. Or, to frame the issue in the language of *Hayward*, we find on review that the trial court "probably would not have arrived at the same verdict" had it not erred in disposing of the unjust enrichment issue by mistakenly including a diligence element. *Id.*

{¶ 24} Accordingly, we sustain Cahill's first assignment of error.

## B. Second Assignment of Error–Whether the Trial Court Erred in Referencing the Statute of Frauds

{¶ 25} Cahill argues that the trial court erred in sua sponte observing that Cahill had failed to comply with the statute of frauds in originally orally renting the real estate in question to the Carters and that he failed to file his purported power of attorney in accordance with R.C. 1337.04. Having sustained Cahill's first assignment of error, we find this second assignment of error to be moot for now.

## IV. CONCLUSION

{¶ 26} The trial court erred in holding that Cahill could not prevail on his claim for unjust enrichment because he had not exercised "ordinary diligence" in pursuing the claim. We, therefore, sustain Cahill's first assignment of error and find his second assignment of error is moot for now. We reverse and remand to the Franklin County Municipal Court for proceedings consistent with this decision.

*Judgment reversed; and cause remanded.*

BROWN, J., concurs.
LUPER SCHUSTER, J., concurs in judgment only.

———————————

*v. Vattier* (1835), 34 U.S. 405, 416, 9 L. Ed. 173. Justice Story, who delivered the opinion of the court in Vattier, explained that "'*[n]othing can call forth this court into activity but conscience, good faith and reasonable diligence. Where these are wanting, the court is passive and does nothing; laches and neglect are always discountenanced; and therefore from the beginning of this jurisdiction there was always a limitation of suit in this court.*' * * * " Id.* at 416-417.

(Emphasis sic and added.) *State ex rel. Allied Sys. Holdings v. Donders*, 10th Dist. No. 11AP-960, 2012-Ohio-5855, ¶ 18, quoting *State ex rel. Case v. Indus. Comm.*, 28 Ohio St.3d 383, 385 (1986); a*ccord Nob Hill E. Condominium Owners' Assn. v. Vecchio*, 8th Dist. No. 65512 (Dec. 9, 1993) ("The party against whom the doctrine of laches is asserted must offer 'an acceptable explanation' for the delay in asserting its rights.").