[Cite as *Wildenthaler v. Galion Community Hosp.*, 2019-Ohio-4951.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

Paul C. Wildenthaler, Administrator
of the Estate of Kay C. Wildenthaler,

Plaintiff-Appellant,

v.

Galion Community Hospital, et al.,

Defendants-Appellees.

:
:
:
:
:
:
:
:

No. 18AP-574
(C.P.C. No. 15CV-5091)

(REGULAR CALENDAR)

D E C I S I O N

Rendered on December 3, 2019

**On brief:** *Law Offices of Daniel R. Mordarski LLC,* and *Daniel R. Mordarski*; *Oliver Law Office,* and *Jami S. Oliver*, for appellant. **Argued:** *Daniel R. Mordarski.*

**On brief:** *Robison, Curphey & O'Connell, LLC*, *Julia Smith Wiley*, and *Corey L. Tomlinson,* for appellee, Mary Wadika, D.O. **Argued:** *Corey L. Tomlinson.*

**On brief:** *Gallagher Sharp*, *Monica A. Sansalone, Theresa A. Richthammer*, and *Quinn M. Schmiege,* for appellee, John Kerns, D.O. **Argued:** *Quinn M. Schmiege.*

APPEAL from the Franklin County Court of Common Pleas

BRUNNER, J.

{¶ 1} Plaintiff-appellant, Paul C. Wildenthaler, administrator of the estate of his late wife, Kay C. Wildenthaler (as a collective party, "Wildenthaler"), appeals from a judgment in favor of defendants-appellees, Mary Wadika, D.O., and John Kerns, D.O., entered on May 8, 2018, after a jury rendered a general verdict for the defendants. Wildenthaler also appeals the trial court's decision, entered on June 27, 2018, denying his motion for a new trial. Because we find the trial court erred by permitting the jury to

execute a general verdict without completing interrogatories consistent with the general verdict, we sustain Wildenthaler's assignment of error and reverse and remand for a new trial.

## I.   FACTS AND PROCEDURAL HISTORY

{¶ 2}   On Saturday, June 22, 2013, at 2:00 a.m., Kay Wildenthaler ("Kay[1]") and her husband, Paul Wildenthaler ("Paul"), went to the emergency room of the Galion Community Hospital.  (Wildenthaler Ex. 15.)  Kay complained of back pain that had been ongoing for several days and which had worsened progressively.  *Id.* at 1.  She related that she had been given Tylenol with codeine in connection with treatments related to lung cancer and had taken four doses without perceptible effect.  *Id.*  She was seen by Dr. Kerns. *Id.*  According to the records dictated by Dr. Kerns, Kay was 73, appeared uncomfortable, cachectic[2] and "really look[ed] like a walking skeleton."  *Id.*  He noted a respiratory rate of 20 and an oxygen saturation level of 94 percent on room air (no oxygen tank).  *Id.* at 1.  In addition, an x-ray revealed pre-existing compression fractures of T12 and T7, diffuse osteoporotic demineralization, and a mass or infiltrative change of the left upper lobe of her lung.  *Id.* at 9.  Dr. Kerns gave her hydrocodone 7.5 mg with some amount of Tylenol (the records are unclear whether it was 325 mg or 500 mg) and sent her home with instructions to take further doses of the same as needed and see her family physician in three days.  *Id.* at 1; *see also* Tr. Vol. I at 184-86, filed Nov. 5, 2018.

{¶ 3}   Kay and Paul returned to the emergency room again later in the same day, at 7:08 a.m., with Kay still complaining of back pain, and they were seen by Dr. Wadika. (Wildenthaler Ex. 16 at 1.)  Dr. Wadika also marked Kay's cachectic appearance and recorded a body weight of 32 kg (70.5 lb[3]).  Dr. Wadika recorded diminished breath sounds but otherwise clear lungs with a respiration rate of 28 and an oxygen saturation level of 93 percent.  *Id.* at 2.  In light of the fact that Kay had already taken "a Vicodin[4] earlier without any pain relief," Dr. Wadika gave Dilaudid[5] and then waited 30 minutes to observe the

---

[1] As Kay and Paul Wildenthaler share a last name, we shall, for clarity, refer to them by their first names.  No informality or lack of respect is intended by this choice.

[2] A person is cachectic or has cachexia when they show "general physical wasting and malnutrition usually associated with chronic disease."  *Merriam-Webster Online Dictionary*, https://www.merriam-webster.com/dictionary/cachexia (last accessed Nov. 15, 2019).

[3] 32 kg * 2.2 kg/lb = 70.5 lb

[4] Vicodin contains hydrocodone (an opioid pain-reliever) and Tylenol.

[5] Dilaudid is hydromorphone (an opioid pain-reliever).

effect. *Id.* When Kay reported mild relief but still showed restlessness, Dr. Wadika gave 25 mg Benadryl intramuscularly and waited a further 25 or 30 minutes. *Id.* At that time, when restlessness had decreased some but Kay still complained of pain, Dr. Wadika gave Percocet[6] orally. *Id.* Dr. Wadika then discharged Kay with a prescription for Duragesic 12.5, a patch dispensing 12.5 micrograms of fentanyl (an opioid pain-reliever) per hour transdermally. *Id.* Dr. Wadika concluded that Kay's pain was related to compression fractures and metastatic cancer and instructed Kay to see her family doctor on Monday. *Id.*

{¶ 4} Kay and Paul returned to the emergency room a final time on Sunday, June 23, 2013, at 2:33 p.m., and were seen by Dr. Kerns and his physician's assistant, Haley Bartholomew. (Wildenthaler Ex. 17 at 4.) Bartholomew noted Kay's apparent discomfort despite having had Tylenol with codeine at 10:00 a.m. and having placed the fentanyl patch (Duragesic) at 11:00 a.m. *Id.* Her respirations were recorded at 28 and her oxygen saturation was 92 percent on room air. *Id.* at 5. A CT scan (computed tomography scan) of her back showed a compression fracture not previously observed at the T6 level. *Id.* at 12. Kay was treated intravenously with 30 mg Norflex (a muscle relaxer) and 15 mg Toradol (a non-opioid pain reliever). *Id.* at 5. Bartholomew gave her a Percocet orally when she continued to experience pain and, when that did not relieve the pain, followed up with 4 mg of intravenous morphine. *Id.* After the morphine, Kay felt better and Bartholomew discharged her with instructions to leave the patch on, take half a Vicodin in the event she began to be in pain again, followed by the other half of the Vicodin if, after an hour, the first half-pill had provided no relief. *Id.* Dr. Kerns and Bartholomew discussed Kay's situation and Dr. Kerns agreed with the course and management of the case. *Id.*

{¶ 5} According to Paul's testimony at trial, Kay seemed lethargic when he got her home from the emergency room and slept peacefully most of the day on Monday, June 24. (Tr. Vol. II at 52-56, filed Nov. 5, 2018.) At one point, even though she was groggy, Kay seemed restless. *Id.* at 56-59. So, as instructed, he gave her another half a Vicodin. *Id.* Paul did not call the family doctor on Monday because Kay seemed to be resting. *Id.* at 59-60. In order to avoid disturbing her, he slept in the spare bedroom on Monday night. *Id.* at 60-61. When he awoke and checked on her Tuesday at 6:00 a.m., she was cold. *Id.* at 61-62.

---

[6] Percocet contains oxycodone (an opioid pain-reliever) and Tylenol.

{¶ 6} The autopsy and toxicology reports, issued approximately four months after Kay's death, were somewhat self-contradictory. (Wildenthaler Ex. 29.) The coroner's report concluded that the "[c]ause of death" was "METASTATIC CARCINOMA OF LUNG." (Emphasis sic.) *Id.* at 1. Yet it concluded the "[m]anner of death" was an "[a]ccident" and listed "[h]ow the injury occurred" as "TOOK EXCESSIVE PRESCRIPTION MEDICATION." (Emphasis sic.) *Id.* It also recognized "[s]ignificant condition[s]" of "ACUTE COMBINED DRUG INTOXICATION" and "SEVERE PANLOBULAR EMPHYSEMA." (Emphasis sic.) *Id.* The toxicology report noted in relevant part the presence of fentanyl, hydrocodone, morphine, noroxycodone, oxycodone, and oxymorphone in blood samples taken from Kay's heart and in her urine. *Id.* at 7. The amount of fentanyl in Kay's heart blood was less than 3 nanograms per milliliter, below the toxicity threshold of more than 5 nanograms per milliliter. *Id.*

{¶ 7} Just short of two years after Kay's death, on June 16, 2015, Paul brought suit against Dr. Kerns and Wadika for wrongful death.[7] (June 16, 2015 Compl.) The complaint alleged that "Kay died from respiratory depression because the [f]entanyl and other opioid medication prescribed by [the defendants] combined with Kay's diminished lung functions from her lung cancer and emphysema caused her to stop breathing." *Id.* at ¶ 42. Trial began on April 23, 2018. (Tr. Vol. I at 1.)

{¶ 8} During the week-long trial, 14 witnesses testified. As the issues in this appeal are limited, we likewise limit our discussion of their testimony.

{¶ 9} Drs. Kerns and Wadika testified to the course of treatment they provided. Both indicated that when they saw Kay, they felt that she was in extremely poor health, that she did not have long to live, and that she was in pain due, at least in part, to her advanced lung cancer. *Id.* at 65-66, 71-72, 94, 96-98, 159, 180, 188, 206-08, 212-15; Tr. Vol. III at 352-54, filed Nov. 5, 2018; Tr. Vol. IV at 263-64, 276-77, filed Nov. 5, 2018. While acknowledging that both the manufacturer of Duragesic and the FDA had warned against the use of fentanyl patches in cases where the patient has not already developed a tolerance to opioids because of the risk of respiratory depression and death, each doctor opined that neither of them violated the standard of care or caused Kay's death in permitting her to use

---

[7] The complaint also named other persons and entities. However, these persons and entities were dismissed from the action prior to trial. (Feb. 6, 2018 Notice of Dismissal.)

the patch, particularly at such a low dose.  (Tr. Vol. I at 100-08, 119-20, 223-24; Tr. Vol. III at 362-63; Tr. Vol. IV at 276-78.)

{¶ 10}  In addition to relating the circumstances surrounding Kay's death, Paul and his son (Jeff Wildenthaler) testified that Kay was always an extremely slightly built woman (weighing around 85 to 100 pounds when healthy), had not lost much weight during cancer treatment, and had received a very good report from her oncologist indicating that she was responding well to treatment.  (Tr. Vol. II at 7, 25-29, 138-46, 159-60.)

{¶ 11}  The plaintiff called two experts to testify.  The first, an emergency room doctor, Frederick Carlton, M.D., testified that using the patch on Kay was a terrible decision.  (Tr. Vol. II at 210-11.)  Her frail condition, low weight, lung problems (including COPD and lung cancer), and lack of an established tolerance for opioids put her at risk for respiratory depression.  *Id.*  Use of the patch in a case like Kay's was contraindicated by both the FDA warnings and manufacturer's instructions.  *Id.* at 213-14.  Even if it had been necessary to use the patch, Dr. Carlton opined that Kay should have been admitted to the hospital for observation and monitoring.  *Id.* at 215.  Based on the timeline of events and the clinical conditions, Dr. Carlton explained there was no good explanation for the cause of Kay's death other than respiratory depression.  *Id.* at 225-33.  Accordingly, he opined that she died of a fentanyl overdose.  *Id.* at 225.  He further opined that Dr. Wadika breached the standard of care in prescribing the patch for Kay to fill and use at home given her small size, lack of significant opioid tolerance history, and frail condition.  *Id.* at 234-38.  He testified that Dr. Kerns violated the standard of care by allowing Kay to go home still wearing the patch rather than removing the patch or admitting her to the hospital.  *Id.* at 239-42.

{¶ 12}  The plaintiff's second expert, a hospitalist, Cregg Ashcraft, M.D., testified similarly.  He opined that in the absence of any evidence of another possible cause of death, respiratory depression brought on by the fentanyl patch was the cause of Kay's death.  (Tr. Vol. III at 70-77, 173-79.)  Though he did not directly opine whether Drs. Wadika and Kerns violated the standard of care, he testified that Kay should have been admitted for observation and monitoring if she was going to be on the patch.  *Id.* at 58-65, 110-11, 154-55.

{¶ 13} The defense called four experts, two emergency room doctors, Neal Little, M.D., and Michael Dick, M.D.; a forensic pathologist, Carl Schmidt, M.D.; and a forensic toxicologist, John Wyman, Ph.D.

{¶ 14} Drs. Little and Dick testified that the defendants met the standard of care. Dr. Little testified that Dr. Wadika was trying to be creative in dealing with intractable pain and that, given the failure of so many other options, the fentanyl patch was a reasonable thing to try. (Tr. Vol. IV at 49-51.) Because Kay had tolerated many times the dose of opioids that the patch was capable of releasing, and because of the very low levels of fentanyl detected in her blood during the autopsy, he opined that Dr. Wadika's treatment did not cause Kay's death. *Id.* at 49-52, 78. Dr. Dick found the approach taken by the emergency room doctors in the case to have been a reasonable escalation of opioid treatment and not violative of the standard of care. (Tr. Vol. V at 30-33, 36-39, 41-42, 50.) In this connection, he noted that some evidence in the autopsy of necrotic tissue in her spine could suggest that the cancer had progressed to her bones. *Id.* at 33-34. While he acknowledged that it might have been a safer option to admit Kay, he observed that being admitted is not a pleasant experience and opined that it did not violate the standard of care for the doctors to have failed to insist that she be admitted. *Id.* at 42-44, 50. He concluded that neither Dr. Kerns' care nor Dr. Wadika's care caused Kay's death. *Id.* at 33-34, 48, 51.

{¶ 15} Dr. Schmidt opined that Kay did not die of a fentanyl overdose but was more likely just worn out by age and malnourishment (as a consequence of disease). (Tr. Vol. IV at 107, 115, 126-27.) He admitted that Kay's full bladder and heavy lungs at the time of the autopsy are both signs of an opioid overdose and that there have been cases in which people have died of fentanyl overdoses with less than three nanograms per milliliter blood concentration. *Id.* at 145-46, 163-64. Nonetheless, he opined that her death was a natural result of not having enough muscle, fat, and energy stores to run her vital body processes. *Id.* at 131-32, 159.

{¶ 16} Dr. Wyman's testimony agreed with many aspects of Dr. Schmidt's. He stated that blood drawn from the heart often shows falsely inflated levels of drugs because of post-mortem redistribution, which is when decomposition processes release drugs from organs and tissues where they are stored and the drugs make their way into the chest-cavity blood. *Id.* at 195-97. In this case, given that a toxic level of fentanyl is 5-10 nanograms per

milliliter, while 10-15 nanograms per milliliter is toxic to fatal, and 15 nanograms per milliliter is generally fatal, Kay's heart blood concentration of below 3 nanograms per milliliter was not likely the cause of death. *Id.* at 207-08. Dr. Wyman acknowledged that drug concentrations can drop in overdose cases where a person dies a lingering death and that a full bladder and heavy lungs are two indications of an opioid overdose. *Id.* at 211-12, 236-39, 246. Nevertheless, Dr. Wyman testified that one cannot say to a reasonable degree of medical certainty that Kay died from an opioid overdose based on the toxicology results. *Id.*

{¶ 17} In the closing argument, the attorney for Wildenthaler talked the jurors through how, based on the evidence presented at trial, the jury should decide each of the ten interrogatories that were presented with the verdict forms. (Tr. Vol. V at 94-98.) In instructing the jury, the judge also explained the use of the interrogatories. *Id.* at 195-99. In addition to paraphrasing each interrogatory, the judge instructed the jury:

> You will be given written questions called interrogatories. You must answer them in writing starting with the first question. You must carefully follow the directions about how to proceed because the directions will tell you what questions to answer and whether to sign the general verdict form for the plaintiff or for the defendants.
>
> A question in the interrogatory is answered when at least six of the jurors agree. All who agree must sign. If six jurors cannot agree on the answer, you will be instructed to report that to the court.
>
> * * *
>
> * * * As regards to the jury interrogatories, do not assume that because you have been provided with multiple interrogatories that all of them must be completed. The interrogatories will instruct you as to which interrogatories and verdict forms must be completed based upon your answers.

*Id.* at 179, 190.

{¶ 18} After deliberating for a period of time, the jury posed a question to the trial court:

> In reference to jury instructions page 11, paragraph beginning "If you find the Plaintiff failed to prove." , [sic] six jurors feel

> the <u>plaintiff failed to prove the cause of death.</u> We are unable to have six jurors agree on Interrogatory 1 and 3.
>
> If we do agree that the Plaintiff failed to prove cause of death, do we need to agree on the negligence?

(Juror Question 1, Ex. 1 to May 24, 2018 Dr. Wadika Memo. in Opp.) Interrogatories 1 and 3 were the interrogatories asking whether Drs. Kerns or Wadika, respectively, were negligent in their care and treatment of Kay. (Jury Interrogatories at 1, 3, filed May 2, 2018.) The interrogatories instructed that interrogatories 1 through 4 had to be completed in numerical order. *Id.* at 1-4. In effect, the interrogatories instructed the jury to first decide whether the doctors were negligent before moving to consider whether their negligence caused Kay's death. However, each interrogatory stated: "If six jurors cannot agree on an answer to this Interrogatory, report this to the Court." *Id.* in passim.

{¶ 19} The attorney for Wildenthaler argued that the trial court should instruct the jury that the interrogatories had to be completed in numerical order as the instructions indicated. (Tr. Vol. VI at 4, filed Nov. 5, 2018.) After some initial discussion, attorneys for both Drs. Kerns and Wadika took the opposite position, that the jury could consider causation independently from negligence. *Id.* at 11-14. After hearing arguments from both sides, the trial court reasoned that "if they don't have six [jurors] that agree on negligence but they have six that agree * * * on causation [] that's case[-]dispositive. And -- and to make them sit there and discuss negligence when[/]if, in fact, there are six that agree on the question of [causation] * * * is a waste of everybody's time and effort." *Id.* at 9. Ultimately, the trial court decided to answer the jury's question in the negative, thereby permitting the jurors to proceed to consider causation. *Id.* at 14.

{¶ 20} The jury then asked a second question:

> In reference to the previous question, six are agreed the plaintiff failed to prove the cause of death. May we proceed to the verdict since we are unable to complete the interrogatories?

*Id.* at 15. The attorney for Wildenthaler repeated his argument that the interrogatories must be completed in order and asserted that if the jurors could not do that, a mistrial should be granted. *Id.* at 15-16. Based on the fact that the jury apparently believed the cause of death had not been proven, attorneys for Drs. Kerns and Wadika reasoned that completion of a general verdict in their client's favor would be appropriate notwithstanding

the jury's failure to answer the specific questions posed by the interrogatories as to negligence and proximate causation. *Id.* at 16-17. The trial court decided to answer the question in the affirmative, thereby permitting the jury to complete the verdict without answering even the interrogatory on causation. *Id.* at 18.

{¶ 21} After receiving the trial court's response to the second question, the jury announced a general verdict in favor of the defendants. *Id.* at 20-21; Verdict Forms at 1-2, filed May 2, 2018. The jury completed none of the interrogatories. (Tr. Vol. VI at 20.) A jury poll of the six jurors who signed the general verdict revealed no dissenting jurors. *Id.* at 21-22. The trial court memorialized the verdict in a judgment in favor of defendants on May 8, 2018. (May 8, 2018 Jgmt. Entry.)

{¶ 22} On May 10, 2018, Wildenthaler moved for a new trial.[8] (May 10, 2018 Mot. for New Trial.) After the parties fully briefed the matter, on June 27, 2018, the trial court denied Wildenthaler's motion. (June 27, 2018 Decision & Entry.) The trial court reasoned that the fault in the jury's struggle with the interrogatories was in the interrogatory forms, not the jury's reasoning. *Id.* at 3. That is, the interrogatories improperly required the jury to reach a consensus (six votes of eight) one way or the other on the question of whether each doctor was negligent <u>before</u> considering the cause of Kay's death. *Id.* at 3-4. Yet negligence and proximate cause are both necessary elements of a wrongful death claim, and so the failure to prove the manner of Kay's death rendered the question of negligence irrelevant. *Id.* at 4. Just because the jury could not reach a consensus on whether or not the doctors were negligent does not mean that the jurors could not reach a decision on whether or not Kay's death was a result of the treatment the doctors provided. *Id.* Thus, the court concluded that the plaintiff had suffered no prejudice as a result of the jury's failure to complete the interrogatories. *Id.*

{¶ 23} Wildenthaler now appeals.

## II. ASSIGNMENT OF ERROR

{¶ 24} Wildenthaler presents a single assignment of error for review:

---

[8] Although the caption and preamble of the motion also suggested Wildenthaler was requesting judgment notwithstanding the verdict, Wildenthaler did not argue for or request judgment notwithstanding the verdict in the body of the memorandum in support. (May 10, 2018 Mot. for New Trial in passim.)

THE TRIAL COURT ERRED AS A MATTER OF LAW BY NOT ORDERING A NEW TRIAL WHERE JURORS DID NOT ANSWER ANY OF THE JURY INTERROGATORIES.

## III. DISCUSSION

{¶ 25} Ohio Rule of Civil Procedure 59 sets forth grounds on which a court may grant a new trial as follows:

> (A) **Grounds for new trial.** A new trial may be granted * * * upon any of the following grounds:
>
> (1) Irregularity in the proceedings of the court, [or] jury, * * * by which an aggrieved party was prevented from having a fair trial;
>
> (2) Misconduct of the jury * * * ;
>
> * * *
>
> (9) Error of law occurring at the trial and brought to the attention of the trial court by the party making the application.
>
> In addition to the above grounds, a new trial may also be granted in the sound discretion of the court for good cause shown.

Civ.R. 59(A).

{¶ 26} We have previously explained the standard of appellate review for decisions on motions for a new trial:

> Consistent with the fact that the rule is permissive (may) rather than mandatory (shall), we generally review decisions on motions for new trials under an abuse of discretion standard. *Frash v. Ohio Dep't of Rehab. & Corr.*, 10th Dist. No. 14AP-932, 2016-Ohio-360, ¶ 7, 59 N.E.3d 566, citing *Reeves v. Healy*, 192 Ohio App.3d 769, 2011-Ohio-1487, ¶ 18, 950 N.E.2d 605 (10th Dist.). However, it is also true that "no court has the authority, within its discretion, to commit an error of law." [*State v.*] *Akbari*[, 10th Dist. No. 13AP-319, 2013-Ohio-5709,] ¶ 7. Thus we have also observed that " 'when the basis of the motion [for a new trial] involves a question of law, the de novo standard of review applies, and when the basis of the motion involves the determination of an issue left to the trial court's discretion, the abuse of discretion standard applies.' " *Frash* at ¶ 7, quoting *Dragway 42, L.L.C. v. Kokosing Constr. Co.*, 9th Dist. No. 09CA0073, 2010-Ohio-4657, ¶ 32.

*Shaw v. Underwood*, 10th Dist. No. 16AP-605, 2017-Ohio-845, ¶ 32.[9] In this case, the two issues appear to be legal questions—whether the jury was permitted to answer the interrogatories out of order and whether, even if they were permitted to answer out of order, they were permitted to fail to answer entirely.

{¶ 27} Ohio Rule of Civil Procedure 49 provides for the use of jury interrogatories:

> (B) **General verdict accompanied by answer to interrogatories.** The court shall submit written interrogatories to the jury, together with appropriate forms for a general verdict, upon request of any party prior to the commencement of argument. Counsel shall submit the proposed interrogatories to the court and to opposing counsel at such time. The court shall inform counsel of its proposed action upon the requests prior to their arguments to the jury, but the interrogatories shall be submitted to the jury in the form that the court approves. The interrogatories may be directed to one or more determinative issues whether issues of fact or mixed issues of fact and law.
>
> The court shall give such explanation or instruction as may be necessary to enable the jury both to make answers to the

---

[9] Frequent perfunctory citation to *Blakemore v. Blakemore*, has often resulted in the incorrect suggestion that an abuse of discretion is "*more than a mere error of law* or judgment." (Emphasis added.) *See, e.g., State v. Clinton*, 153 Ohio St.3d 422, 2017-Ohio-9423, ¶ 60, citing *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, (1983). This concept originated in *Steiner v. Custer*, and *Steiner* came by it through reference to the second edition of *Black's Law Dictionary. Steiner v. Custer*, 137 Ohio St. 448, 451 (1940). However, *Steiner*'s comments on abuse of discretion were only "in relation to the present controversy," and did not purport to define the term generally. *Id.* Moreover, the second edition of *Black's* actually did not include the language that abuse of discretion is "*more than a mere error of law* or judgment." (Emphasis added.) *Blakemore* at 219. Rather, that early edition of *Black's* defined abuse of judicial discretion by stating, "[t]his term, commonly employed to justify an interference by a higher court with the exercise of discretionary power by a lower court, implies *not merely an error of judgment*, but perversity of will, passion, prejudice, partiality, or moral delinquency. The exercise of an honest judgment, however erroneous it may appear to be, is not an abuse of discretion." (Emphasis added.) *Black's Law Dictionary* 11 (2d Ed.1910). The modern edition of *Black's*, defines abuse of discretion so as to fully take into account the fact that an error of law constitutes an abuse of discretion. It states that an abuse of discretion is "[a]n adjudicator's failure to exercise sound, reasonable, *and legal* decision-making," or "[a]n appellate court's standard for reviewing a decision that is asserted to be grossly unsound, unreasonable, *illegal, or* unsupported by the evidence." (Emphasis added.) *Black's Law Dictionary* 12 (10th Ed.2014). Moreover, courts that have directly considered the matter have invariably concluded that a court does not have discretion to violate the law. *See State v. Boles*, 187 Ohio App.3d 345, 2010-Ohio-278, ¶ 15-26 (2d Dist.) (discussing the varying formulations of what constitutes abuse of discretion and concluding "[n]o court -- not a trial court, not an appellate court, nor even a supreme court -- has the authority, within its discretion, to commit an error of law"); *see also, e.g., State v. Robinson*, 10th Dist. No. 17AP-707, 2018-Ohio-1166, ¶ 7*; State v. Moncrief*, 10th Dist. No. 13AP-391, 2013-Ohio-4571, ¶ 7. In short, though *Steiner*'s incautious misstatement of *Black's* has continued to persist in the caselaw as an improper generalized definition, the modern Supreme Court of Ohio has opined, " '[a] court abuses its discretion when its ruling is founded on an error of law or a misapplication of law to the facts.' " *Independence v. Office of the Cuyahoga Cty. Exec.*, 142 Ohio St.3d 125, 2014-Ohio-4650, ¶ 49, quoting *Doe v. Natl. Bd. Of Med. Examiners,* 199 F.3d 146, 154 (3d. Cir.1999).

interrogatories and to render a general verdict, and the court shall direct the jury both to make written answers and to render a general verdict.

When the general verdict and the answers are consistent, the appropriate judgment upon the verdict and answers shall be entered pursuant to Rule 58. *When one or more of the answers is inconsistent with the general verdict, judgment may be entered pursuant to Rule 58 in accordance with the answers, notwithstanding the general verdict, or the court may return the jury for further consideration of its answers and verdict or may order a new trial.*

(Emphasis added.) Civ.R. 49(B). In other words, where a general verdict is inconsistent with the interrogatory answers, a trial court has three options: (1) to enter judgment in accordance with the answers; (2) to return the jury for further consideration; or (3) to order a new trial. But if the interrogatories are blank, there is no way to know what general verdict would be "in accordance with the answers." *Id.* And if the trial court discharges the jury, it no longer has the option to "return the jury for further consideration." *Id.* In such cases, its options narrow to one—"order[ing] a new trial." *Id.*

{¶ 28} Consistent with this reading of the rule, caselaw in Ohio is to the effect that where a jury does not complete all necessary interrogatories or completes them in a way that is inconsistent with the general verdict and the trial court discharges the jury, a new trial is to be granted. *State ex rel. Bd. of State Teachers Retirement Sys. v. Davis*, 113 Ohio St.3d 410, 2007-Ohio-2205, ¶ 38, 46 (failure to answer interrogatories on punitive damages meant that the jury had not completed its duties to resolve the claims at issue in the case and a new trial was necessary); *Aetna Cas. & Surety Co. v. Niemiec*, 172 Ohio St. 53 (1961), paragraphs two through four of the syllabus ("don't know" answers on interrogatories were not definite answers and required a new trial); *cf. Bloor v. Platt*, 78 Ohio St. 46 (1908), paragraph two of the syllabus (noting that an answer of "don't know" to interrogatories on elements of the plaintiff's claim is consistent with a general verdict for defendants).

{¶ 29} In this case, we agree with the trial court's resolution of the first jury question. (June 27, 2018 Decision & Entry at 3-4.) That is, we agree (and have previously held) that the model interrogatories provided in the Ohio Jury Instructions are flawed in that they wrongly imply that interrogatories on negligence and proximate cause must be answered in order of negligence first and that the full jury cannot consider both negligence and

proximate causation. *Dillon v. OhioHealth Corp.*, 10th Dist. No. 13AP-467, 2015-Ohio-1389, ¶ 24-27 (holding that "[p]roximate cause is a separate question not dependent on a finding of negligence" and that the Ohio Jury Instructions, CV Section 403.01 (Rev. Oct. 11, 2008) was erroneous in that it operated to prevent a full jury from independently considering negligence and proximate causation); *see also O'Connell v. Chesapeake & Ohio RR. Co.*, 58 Ohio St.3d 226, 235-36 (1991) (noting that the full jury is to deliberate as to negligence and proximate cause); *Estate of Lawson v. Mercy Hosp. Fairfield*, 12th Dist. No. CA2010-12-340, 2011-Ohio-4471, ¶ 16 (where the court "recognized that a party's right to a full jury would in fact be deprived if the full jury were not permitted to deliberate as to both negligence and proximate cause"). Thus, we agree with the trial court and rely on our prior precedent; interrogatories that restrict the order in which jurors consider negligence and proximate cause (and which therefore restrict the jurors' participation in considering proximate cause) are not appropriate.

{¶ 30} In this case, jurors who would find that Drs. Kerns and Wadika had been negligent could still have answered the question of whether the doctors' negligence had or had not caused Kay's death. Jurors who would not have found that Drs. Kerns and Wadika were negligent could also still have found that the doctors' course of treatment had or had not caused Kay's death. That is, the jury could have believed, for example, that Kay died of natural causes, or that the defendants' negligent treatment killed her, or that she was so frail that even treatment within the standard of care proximately caused her death. As was true in *Dillon*, negligence and proximate cause are separate and independent inquiries. *See Dillon* at ¶ 24, fn. 6. Regardless of whether or not a juror thought Drs. Kerns or Wadika had been negligent, that juror could still entertain a variety of conclusions about the cause of Kay's death. By suggesting otherwise and insisting that the jury decide negligence first, thus prohibiting full jury consideration of proximate cause, the interrogatories were in error, and the trial court was correct to allow the jury to proceed to consider proximate cause when the jury asked permission to do so.

{¶ 31} However, after resolving the jury's first question and permitting the jury to consider proximate cause without first answering the negligence interrogatory, we see no reason why the jury should have been excused from answering the interrogatories on proximate causation. Regardless of a juror's position on whether there was negligence, that

juror could still have offered a definite answer to the question, "Did [the defendants'] negligence directly and proximately cause Kay Wildenthaler's death?" (May 2, 2018 Interrogatories at 2, 4.) Accordingly, the trial court should not have permitted the jury to skip the remaining interrogatories and move directly to the verdict forms. In so doing and then discharging the jury, the trial court created a mistrial under Civ.R. 49(B) and Ohio precedent because the jury did not complete its assigned task. Essentially, being unable to reach a majority consensus for either a negative or positive answer on interrogatories for negligence or proximate cause, the jury was hung and a defense verdict was therefore inconsistent. A new trial is required. *Davis*, 2007-Ohio-2205, at ¶ 38, 46; *Niemiec*, 172 Ohio St. 53, at paragraphs two through four of the syllabus.

{¶ 32} Dr. Kerns and Wadika argue that the jury forewoman's questions suggest that the jury's failure to complete the verdict forms was consistent with the general defense verdict. (Dr. Wadika's Brief at 6-11; Dr. Kerns' Brief at 32-41.) That is, Drs. Kerns and Wadika assert that the questions show that the jury believed Wildenthaler had failed to prove the cause of Kay's death, which means the general verdict in favor of the defense is consistent with the jury's failure to answer questions about whether the defendants' "negligence directly and proximately cause[d] Kay Wildenthaler's death." (May 2, 2018 Interrogatories at 2, 4.) We do not agree. First, the jury forewoman's note, executed only by her, cannot speak for the entire jury in the manner in which an interrogatory executed by a 75 percent majority does. We simply have no way of knowing if the forewoman accurately understood and indicated the view of a 75 percent majority of the jury on the issue of causation.

{¶ 33} More important, if the jury indeed believed that the plaintiff had failed to prove the cause of Kay Wildenthaler's death, then the answer to the interrogatory about whether the defendants' negligence caused Kay Wildenthaler's death was simply "no." Dr. Kerns argues that there was no interrogatory to take account of a jury that was "unable to determine how [Kay's] death occurred "and that in such an instance, the jury's verdict "must be for all Defendants." (Dr. Kerns' Brief at 39, quoting May 2, 2018 Jury Instructions at 11.) But if Wildenthaler failed to prove the manner of Kay's death, then the allegation that the doctors' negligence caused Kay's death was unproven, and the interrogatory about whether that was the cause of death needed to be answered in the negative. Contrary to the

doctors' position, the fact that the jury was apparently unable to answer "no" and fully execute the interrogatory does not indicate that a majority of the jury had definitively found the allegation "unproven"; it rather indicates that the jury was hung on the issue. That the jurors signed general defense verdicts despite being hung on both negligence and proximate cause is an inconsistency. And since the jury has been discharged, that inconsistency can only now be rectified by a new trial. *Davis*, 2007-Ohio-2205, at ¶ 38, 46; *Niemiec*, 172 Ohio St. 53, at paragraphs two through four of the syllabus.

{¶ 34} Drs. Kerns and Wadika also submit what Dr. Kerns' brief characterizes as a cross-assignment of error.[10] (Dr. Wadika's Brief at 21-29; Dr. Kerns' Brief at 43-49.) The essence of their argument is that even if the interrogatory issue constitutes an otherwise reversible error, we should not order reversal because the trial court should have granted them a directed verdict.[11] Drs. Kerns and Wadika urge us to find that the evidence at trial was insufficient as a matter of law to show the cause of Kay's death and thus that they were entitled to a directed verdict.

{¶ 35} The Supreme Court of Ohio has explained the standard for directed verdicts as follows:

> Civ.R. 50(A) motions for directed verdict do not present factual issues but instead present questions of law. *Goodyear Tire & Rubber Co. v. Aetna Cas. & Sur. Co.*, 95 Ohio St.3d 512, 2002 Ohio 2842, 769 N.E.2d 835, ¶ 4. The same is true for a Civ.R. 50(B) JNOV motion. *Posin v. A.B.C Motor Court Hotel, Inc.*, 45 Ohio St.2d 271, 275, 344 N.E.2d 334 (1976) ("The test to be applied by a trial court in ruling on a motion for judgment notwithstanding the verdict is the same test to be applied on a motion for a directed verdict"). Faced with the question of sufficiency through a directed verdict motion, the court must determine whether any evidence exists on every element of each claim or defense for which the party has the burden to go forward.

---

[10] Such a characterization is not necessary under Ohio Rule of Appellate Procedure 3(C)(2).

[11] Another way to characterize the doctors' argument would be that the interrogatory issue is harmless error. We note that "courts are generally required 'at every stage of the proceeding[s]' to 'disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.' " *Cahill v. Owens*, 10th Dist. No. 15AP-925, 2016-Ohio-4972, ¶ 22, quoting Civ.R. 61. The Supreme Court of Ohio has interpreted this inquiry in civil cases to require consideration of whether " 'without th[at] error[]' the factfinder 'probably would not have arrived at the same verdict.' " *Cahill* at ¶ 22, quoting *Hayward v. Summa Health Sys.*, 139 Ohio St.3d 238, 2014-Ohio-1913, ¶ 25.

*Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 25.  The question a trial court confronts in deciding whether to grant a directed verdict or to submit a case to a jury is whether "reasonable minds" could differ on the outcome based on the evidence presented. *Id.* at ¶ 27.  That inquiry does not require any weighing of evidence or questioning of credibility.  *Id.*  In this case, the question is whether there was "any evidence" to support Wildenthaler's allegations that Kay died as a result of negligent prescribing and administration of opioids.

{¶ 36}  In short, there was.  Both of Wildenthaler's expert witnesses opined that Kay died as a result of the fentanyl patch.  (Tr. Vol. II at 225; Tr. Vol. III at 70-77, 173-78.) Although one of Wildenthaler's experts did not directly opine on whether Drs. Kerns and Wadika breached the standard of care, he testified that Wildenthaler should have been admitted to the hospital if she was on the patch.  (Tr. Vol. III at 58-65, 110-11, 154-55.)  The other expert directly testified that both Drs. Kerns and Wadika violated the standard of care; Dr. Wadika, by prescribing the patch to a person of Kay's circumstances, and Dr. Kerns, by allowing her to go home still wearing it.  (Tr. Vol. II at 234-42.)  The defendants were not entitled to a directed verdict and they did not prevail on their motion for directed verdict in the trial court for precisely the reasons we have just enunciated.  (Tr. Vol. III at Tr. at 206-14; Tr. Vol. V at 76-77.)

{¶ 37}  We sustain Wildenthaler's sole assignment of error.

## IV.  CONCLUSION

{¶ 38}  The trial court did not err when it permitted the jury to consider proximate causation without first requiring an agreement on negligence.  However, the trial court did err by permitting the jury to execute a general verdict without completing interrogatories consistent with the general verdict.  Because the trial court discharged the jury without the jury having completed its task and answering interrogatories to justify the general verdict, reversal and remand for a new trial is necessary.

*Judgment reversed and cause remanded.*

BROWN, J., concurs.
BEATTY BLUNT, J., concurs in judgment only.